363 F.Supp. 739 (1973)
UNITED STATES of America, Plaintiff,
v.
STATE OF MISSOURI et al., Defendants.
No. 71 C 555(1).
United States District Court, E. D. Missouri, E. D.
August 27, 1973.
*740 J. Stanley Pottinger, Asst. Atty. Gen., Civil Rights Div., Washington, D. C., Daniel F. Rinzel, Dept. of Justice, Washington, D. C., Donald J. Stohr, U. S. Atty., St. Louis, Mo., for United States of America.
John C. Danforth, Atty. Gen., and D. Brook Bartlett, Asst. Atty. Gen., Jefferson City, Mo., for defendants, State of Missouri, Missouri State Board of Education, Its Members, Arthur L. Mallory, Commissioner of Education.
Erwin Tzinberg, Ziercher, Tzinberg, Human & Michenfelder, Clayton, Mo., for defendants, Berkeley School District, Jack E. Bell, Superintendent.
Marvin S. Wood, St. Louis, Mo., for defendants, Kinloch School District, Arthur C. Shropshire, Superintendent.
Thomas W. Wehrle, St. Louis County Counselor, James H. White, Associate County Counselor, County Government Center, Clayton, Mo., for defendants, St. Louis County Board of Education, George W. Vossbrink, Superintendent, Robert S. Weinstock, President, Quinton C. Keller, Paul A. Luepold, Fred R. Small, Glenn A. Sweet, Clarence J. Wohlwend, Members of the St. Louis County Board of Education.
Norman C. Parker, Flynn & Parker, St. Louis, Mo., for defendants, Ferguson-Florissant RII School District, Warren M. Brown, Superintendent.

*741 ORDER
MEREDITH, Chief Judge.
The Court, having heard the evidence, considered the arguments of counsel, and having entered its Findings of Fact and Conclusions of Law,
It is hereby ordered, adjudged, and decreed:
1. That the defendants, their employees, agents, successors, and all those acting in concert or participation with them are hereby permanently enjoined from discriminating against any person because of race, color, religion, or national origin, in the operation of the public schools of St. Louis County, Missouri.
2. That the defendants State Board of Education, St. Louis County Board of Education, and their members and administrative officers are further enjoined to develop and file with this Court within 60 days of the entry of this order, with copies served upon counsel for all parties, a plan which will disestablish the racially dual system of school districts in St. Louis County and eliminate the continuing effects of past discrimination against, and denial of equal educational opportunities to, students in the Kinloch District. The defendant local school districts and officials, and their employees and agents, are enjoined to cooperate with the state and county defendants in the development of such a plan. The parties shall have thirty (30) days after the filing of the plan to file any objections which they may have.
The plan shall show the projected attendance of students by race at the various schools, as well as the grade structures of the various schools which may be involved in the plan. The plan shall provide for the desegregation of faculty, staff, transportation, and extracurricular activities, Clark v. Board of Education of Little Rock School District, 449 F.2d 493 (8th Cir. 1971), cert. denied, 405 U.S. 936, 92 S.Ct. 954, 30 L.Ed. 2d 812 (1972); Singleton v. Jackson Municipal Separate School District, 419 F. 2d 1211 (5th Cir. 1970), and shall include a justification of any schools in the affected area which are projected as all or substantially all black. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, at 21, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Although racial balance is not required, Swann, supra, at 24, 91 S.Ct. 1267, the plan should seek to achieve the greatest possible degree of actual desegregation taking into account the practicalities of the situation. Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971).
Dates for hearings on any objections and for entry of an order requiring implementation of an approved final plan will be set by subsequent orders. The Court will retain jurisdiction of this cause to insure that a constitutionally-acceptable plan is adopted and that it is operated in a constitutionally permissible fashion.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
This action was commenced on September 3, 1971, when the United States filed a complaint under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6, and the Fourteenth Amendment. Named as defendants were the State of Missouri, the Missouri State Board of Education and its members, the Missouri Commissioner of Education, the St. Louis County Board of Education and its members, the St. Louis County Superintendent of Education, the School District of the City of Berkeley (hereinafter Berkeley District), Ferguson-Florissant RII School District (hereinafter Ferguson District), the Kinloch School District (hereinafter Kinloch District), and the respective superintendents of the three local districts.
The complaint alleged that the defendants were state and local public officials and agencies responsible for the general supervision and operation or organization of the named school districts. It was further alleged that Kinloch District *742 was created by the defendants as a school district to be attended exclusively by black students and had been maintained as an all-black district in such a manner as to deny equal educational opportunities to the students attending school there. The Government also contended that other feasible methods of school district organization in St. Louis County were available which would remedy the racial segregation and denial of equal educational opportunities alleged. The defendants filed responsive pleadings, and after extensive discovery, a hearing was held on July 10-13, 1972. Based on the evidence adduced at that hearing, and the pleadings and other papers filed, the Court makes the following findings of fact and conclusions of law:

Findings of Fact
1. The defendant State of Missouri and local school officials and agencies, and their predecessors, operate under color of and pursuant to Missouri law. The State Board of Education is vested with the power to supervise instruction in the public schools and otherwise carry out the educational policies of the state. It also distributes state funds to local school districts. In addition, the State Board has the duty to advise and provide technical assistance to county boards of education in developing school district reorganization plans and may approve or reject such plans. The Commissioner of Education is the chief administrative officer of the State Board and responsible for implementing its directives and policies.
2. The St. Louis County Board of Education is responsible for developing plans for the reorganization of the school districts of St. Louis County. The St. Louis County Superintendent of Education is the chief administrative officer of the County Board and responsible for implementing its directives and policies.
3. The three defendant local school districts are agencies of the State of Missouri, and, together with the named superintendents, are responsible for the operation of the public schools within their respective school district boundaries. Both the Berkeley and the Ferguson districts are immediately adjacent to the Kinloch district, and all three districts are located in St. Louis County, Missouri.
4. The defendant State of Missouri, prior to 1954 required by its laws and constitution that pupils in the public schools be segregated on the basis of race.
5. Prior to 1937 the present Kinloch district and most of the present Berkeley district were one school district known as Kinloch School District Number 18 (hereinafter Kinloch No. 18). The public schools in Kinloch No. 18 were segregated in accordance with Missouri law: one high school and one elementary school were operated for white children; and one elementary school was operated for black children. The subsequent splitting of Kinloch No. 18 into two districts by the incorporation of the City of Berkeley and formation of the Berkeley district had the effect of creating a school district for white students, Berkeley, and another school district for black students, Kinloch. Thus, the existing dualism was made a part of the school district structure mandated by state law, and, consequently, more difficult for the local school officials to correct.
6. Before the incorporation of the City of Berkeley, two unsuccessful attempts had been made to divide Kinloch No. 18 into two separate school districts. The evidence shows that the proposed division of Kinloch No. 18, which was essentially the same in both attempts, was to be along racial lines. Data submitted to a 1937 County Arbitration Board by the proponents of the split include references to the proposed "white" and "colored" districts. Both attempts were rejected by the County Arbitration Board after the residents of the proposed Kinloch district, which was the "colored" district, voted overwhelmingly against the split.
*743 7. On May 3, 1937, shortly after the second unsuccessful attempt to split Kinloch No. 18, a petition was filed with the St. Louis County Clerk seeking to incorporate the City of Berkeley. With the exception of the inclusion of a small portion of an adjacent school district, the boundary lines for the City were almost identical to the boundary lines of the "white" school district proposed in the two previous unsuccessful attempts to divide Kinloch No. 18. By including part of another school district, the City came within the provisions of a state law which permitted the establishment of a separate school district by vote of the residents of any incorporated city which encompassed territory of two or more school districts. In fact, on August 3, 1937, the first official act of the City of Berkeley Board of Aldermen was to adopt and file a plat map of the city because ". . . [t]he inhabitants wished to form a school district coterminous with the boundaries of the city."
8. The Berkeley district was formed in August 1937, and in the 1937-38 school year the Berkeley district had 648 white and 16 black resident students, while Kinloch district had 6 white and 872 black resident students. The school districts remained of one race, however, since by agreement the few white residents of the Kinloch district attended Berkeley schools and the few black residents of Berkeley attended Kinloch schools. Moreover, all teachers and all school board members in the Kinloch district were black, while in Berkeley all teachers and school board members were white. The November 13, 1937, findings and decision of a County Board of Arbitration concerning allocation of funds between Kinloch No. 18 and the Berkeley district accurately summarized the situation as follows:
"Prior to the organization of the Berkeley School District, District 18 was divided into two sections by common consent, one occupied by whites, and the other by colored people. The School Board of the old District 18 recognized this division between whites and colored and undertook to keep the administration of the affairs of the District divided between white and colored, providing white teachers for the white section and colored teachers for the colored section. No white children attended the colored school and no colored children attended the white school. . . ."
". . . No high school building has been erected in the colored section, which is located within the territorial limits of what is now District 18 after the organization of the Berkeley School District. . . . The high school building in the white section (now Berkeley School District) was practically completed before the separation, . . ."
"The division of the District did not change the location of any school building; did not make any change in the teaching staff; did not require any diversion of pupils from one school to another; did not increase or lessen the expenses of operating the schools and happily made no change in the previous division of colored and white schools, teachers or children. . . ."
The evidence shows that the boundaries of the City of Berkeley followed almost precisely the racial residential patterns as they existed in 1937, and the separation of the races was virtually total. The result of the incorporation of the City of Berkeley was to carve an all-white school district out of the former Kinloch No. 18 district.
9. A direct and foreseeable consequence of the creation and maintenance of Kinloch as a small, all-black school district has been the provision of educational opportunities which are, by any of the objectively measurable indicia normally used by defendants, markedly inferior to the opportunities offered in the adjoining Ferguson and Berkeley districts, as well as those offered in most other school districts in St. Louis County.
10. Evidence was presented concerning the relative position of Kinloch district to the Berkeley district, the Ferguson *744 district, and other school districts in St. Louis County in the areas of (1) assessed valuation per pupil in average daily attendance (ADA), (2) adequacy of facilities, (3) faculty qualifications and stability, (4) curricular offerings, and (5) state classification and other accreditation. In all areas, Kinloch district ranked below Berkeley and Ferguson and most other school districts in St. Louis County. For example, in the 1970-71 school year, Kinloch district had the lowest assessed valuation per pupil in ADA of any school district in St. Louis County; Kinloch's assessed valuation was one-third of Ferguson's and one-sixth of Berkeley's. Assessed valuation per pupil in ADA is a significant indicator of a school district's ability to finance education through the local property tax and a factor which county and state officials take into account in initiating and approving school district reorganization plans.
11. The effects of such a low assessed valuation, when coupled with the small size of the Kinloch district, is evident from the comparative facilities, curricula, and faculty salaries which Kinloch can offer. Dr. Clifford Hooker, plaintiff's expert witness, inspected each school building in the three districts involved here and testified that the Kinloch buildings and equipment were markedly inferior to the buildings and equipment in the other two districts, particularly at the high school and junior high school levels. He described the small library, poor lighting, inadequate gym, and small amount of equipment and space for shop, home economics, or other specialty classes at the Kinloch High School. It was his opinion, given the present condition of the building, that no one should go to school there. He gave similar testimony concerning the junior high school and two elementary schools in Kinloch, one of which, he said, should be closed. By contrast, both Berkeley and Ferguson have modern, well-equipped buildings. One other example of the educational disparities between the districts is the number of library books available to the students: Berkeley has 11.5 volumes per student; Ferguson has 8.1 volumes per student; and Kinloch has 4.8 volumes per student.
12. The disparity in available funds is also reflected in the average faculty salaries in the three districts. In 1971-72 Berkeley paid an average salary of $10,089.36, Ferguson paid $9,575.68, and Kinloch paid $7,794.03. Two probable effects of the lower salary in Kinloch are a higher faculty turnover rate and a lower percentage of teachers with master's degrees than the other two districts. Both the stability of the faculty and the training of the available teachers have a significant effect on the quality of the educational program that can be offered. Moreover, Kinloch district's lack of funds, plus its small size, have resulted in a more limited choice of curricula to Kinloch high school students than to high school students in either the Berkeley or Ferguson districts.
13. The Missouri Department of Education recognizes the differences between the school districts by its classification system: Kinloch district is presently classified as AA, while both of the other districts are classified as AAA, the highest rating. It is unusual to find school districts with less than an AAA classification in metropolitan areas of relatively dense population, and, in fact, only two other school districts in St. Louis County have less than an AAA classification.
14. The educational deficiencies of the Kinloch district outlined above have been long-standing problems and have frequently been brought to the attention of county and state officials. School officials and other residents of Kinloch, from the first years of the school district's formation, have met with state and county officials on several occasions concerning the problems faced by the Kinloch district. Annual reports issued by the county superintendent make it clear that the problems are not of recent origin. By its annual evaluations, the State Department of Education was also aware of the educational deficiencies in *745 Kinloch district. For example, in 1955 Kinloch district was assigned an unclassified status. Although Kinloch was subsequently restored to classified status, the Department has continued to note serious deficiencies in Kinloch's education program.
15. In spite of their knowledge that the Kinloch students were racially segregated and that the school district was unable to provide educational opportunities equivalent to the surrounding school districts, the defendants have by their actions maintained Kinloch as a small, virtually all-black school district until this day. On numerous occasions, the county and state defendants have proposed reorganization plans for the school districts in St. Louis County, but have not included Kinloch district in such plans because it was all-black and the officials believed that the voters of surrounding school districts would reject consolidation with Kinloch for that reason. On the one occasion when consolidation of Kinloch with the Berkeley and Ferguson districts was recommended, the reorganization proposal was defeated by referendum.
16. Prior to 1954, the racial identifiability of the Berkeley and Kinloch districts was maintained through a formal arrangement whereby black students residing in Berkeley would attend Kinloch schools and white students living in Kinloch would attend Berkeley schools. Berkeley did not employ any black teachers until 1960, and Kinloch did not employ any white teachers prior to 1967. No white students were enrolled in the Kinloch schools until the 1970-71 school year. In the 1971-72 school year the racial compositions of the faculties and student bodies of Kinloch district and the two immediately adjacent school districts, Berkeley and Ferguson, were as follows:

 Students Faculty
 Total % Black White Black % Black
Berkeley 5,040 20.8 252 12 4.5
Ferguson 18,889 1.9 429 5 1.1
Kinloch 1,201 99.3 8 53 85.5

The above statistics and other evidence show that the present arrangement of school administration offers no prospect, and has never offered any prospect, of disestabilishing the racially dual system of school districts previously established by state action or of relieving the denial of equal educational opportunities to the black students of Kinloch district.
17. The state and county defendants have recognized that fact for many years, but have exercised their powers in such a way as to exclude Kinloch district from any remedial benefits. As late as 1955, Kinloch district was designated as a Negro School District in the state superintendent's report and was assigned as the responsibility of the State Department of Education's Supervisor of Negro Education. Moreover, in exercising their powers of school district reorganization state and county school officials have, because of the race of the resident students, treated Kinloch district differently from other similarly situated school districts.
18. Under Missouri law, the county board of education develops plans for school district reorganization and submits them for approval to the state board. (Rev.Mo.Stats.1969, § 162.61, V.A.M.S.). Since the creation of the St. Louis County Board of Education in 1948, eight different school district reorganization plans have been submitted.
19. Kinloch district's small number of students and low assessed valuation make it a prime candidate for reorganization under the standards employed by the county board. The county superintendent has long been of the opinion that Kinloch district should be reorganized. Likewise, state school officials have thought that Kinloch should be reorganized. In addition, studies concerning school district reorganization, commissioned by the state or county, have uniformly recommended that Kinloch district be consolidated with other school districts. Moreover, in 1967, the Kinloch district itself requested the county board to reorganize it with any other district in St. Louis County. It is, thus, *746 clear that educationally sound and administratively feasible alternative methods of school district organization are available which would facilitate the elimination of the racial segregation of, and the denial of equal educational opportunities to the Kinloch students.
20. Since 1948, virtually every school district in the north county area near Kinloch has been enlarged through reorganization, annexation, or consolidation. Of the eight reorganization plans proposed by the county board, however, only one, the 1949 Revised First Plan, included Kinloch district among those districts proposed for reorganization. Moreover, the county board has refused to devise any reorganization plans consistent with the recommendations of the studies mentioned above or with the request of the Kinloch district.
21. Mr. Arthur L. Summers, director of the State Department of Education Reorganization Section from 1949 to 1968, testified that he was informed by county board members that it would be difficult to reorganize Kinloch because it was all black and the neighboring districts would oppose merger. In conversations with county officials, residents of Kinloch were given the same reason for the county board's failure to reorganize the school district. For example, the minutes of a county board of education meeting reflect the following comments concerning the 1962 University of Chicago Study which recommended the consolidation of Berkeley and Kinloch:
"Mr. Terrill [administrative officer of the Kinloch Board] expressed doubts as to selling the proposition of merger since the problem was not only financial but social as well. Mr. Weinstock [County Board of Education member] posed the question How can we find a solution to the social problem? Mr. Oliver [Kinloch Board President] stated that Berkeley had and was getting negroes as residents through the current sale of homesthat education could be a means of solving the social problem." Mr. Oliver testified that the quoted discussion was in reference to racial problems. The evidence shows, therefore, that both state and county school officials were aware that some racial considerations were involved in the reorganization of Kinloch district and that they acted on those considerations to the detriment of the Kinloch students.
22. The State of Missouri has, through the actions of its officials and agencies or by referenda, created and maintained Kinloch district as a small, all-black school district because of the race of the resident students and has failed to provide those students with educational opportunities equivalent to the opportunities provided students in the immediately surrounding school districts.

Conclusions of Law
1. This Court has jurisdiction of the parties and the subject matter of this action under section 407 of the Civil Rights Act of 1964 (42 U.S.C. § 2000c-6), and under 28 U.S.C. § 1345 and the Fourteenth Amendment.
2. The defendant State of Missouri has assumed the obligation of providing a free, public education to all of the school age children in the State. Mo.Const., Art. IX, § 1(a), V.A.M.S. It has chosen to satisfy that obligation by the delegation of responsibilities to various officials and instrumentalities of the State, including the other defendants herein. Kansas City v. School District of Kansas City, 356 Mo. 364, 201 S.W.2d 930 (1947); School District of Oakland v. School District of Joplin, 340 Mo. 779, 102 S.W.2d 909 (1936); City of Edina to use of Pioneer Trust Co. v. School District of City of Edina, 305 Mo. 452, 267 S.W. 112 (1924). Having chosen to provide a free, public education, the State must insure that the education is provided in a manner which does not discriminate against any group of persons on account of their race and which is consistent with the Equal Protection Clause of the Fourteenth Amendment. Griffin v. County School Board of *747 Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).
3. A state, such as Missouri, which has in the past operated a racially dual system of public education, pursuant to state constitutional and statutory requirements is, and has been since 1954, under an additional constitutional obligation to take such affirmative measures as are necessary to disestablish that dual system and to eliminate the continuing vestiges of that system. Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).
4. Kinloch district was created as a part of Missouri's dual system of public education and remains as a vestige of that system. It is irrelevant that Missouri law did not require school districts to be separated by race where, as here, the establishment of the segregated district was accomplished under color of state law and served to facilitate the segregated system of education at that time required by state law. Haney v. County Board of Education of Sevier County, Ark., 410 F.2d 920, 924 (8th Cir. 1969); United States v. State of Texas, 321 F.Supp. 1043 (E.D.Tex. 1970); 330 F.Supp. 235 (E.D.Tex.1971), modified and affirmed, 447 F.2d 441 (5th Cir. 1971), cert. denied, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972).
5. Even absent the state laws and constitutional provisions requiring racial segregation, the factual circumstances here, which show that, because of the race of its resident students, Kinloch district was created and maintained through state action as a small, racially segregated and inadequately funded school district, establish a violation of the Equal Protection Clause that requires affirmative, corrective action by the State of Missouri and its instrumentalities. United States v. School District 151 of Cook County, Illinois, 404 F.2d 1125 (7th Cir. 1968) and 432 F.2d 1147 (7th Cir. 1970); Davis v. School District of City of Pontiac, Inc., 443 F. 2d 573 (6th Cir. 1971); Kelly v. Guinn, 456 F.2d 100 (9th Cir. 1972); Taylor v. Board of Education of City School District of City of New Rochelle, 294 F.2d 36 (2nd Cir. 1961), cert. denied, 368 U. S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961).
6. The incorporation of the City of Berkeley and subsequent creation of the Berkeley district by the action of a state court and through referenda procedures provided by state statute were state actions within the contemplation of the Fourteenth Amendment. Hunter v. Erickson, Mayor of Akron, 393 U.S. 385, 89 S.Ct. 557, 21 L. Ed.2d 616 (1969); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Lucas v. Forty-Fourth General Assembly of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The evidence showing that the boundaries of the City of Berkeley were of an irregular shape, conforming closely to the racial residential patterns and that the racial separation was virtually complete raises an inference of racial discrimination which the defendants have the burden of overcoming. Gomillion v. Lightfoot, Mayor of Tuskegee, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); State of Alabama v. United States, 304 F.2d 583, 584 (5th Cir. 1962); United States v. Hinds County School Board, 417 F.2d 852, 858 (5th Cir. 1969); Cf. Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953). Given the above evidence of a racial classification by the state, defendants cannot rely upon just any reasonable basis for the action, but must show a compelling state interest in the action taken. Cf. Hawkins v. Town of Shaw, Miss., 437 F.2d 1286 (1971), aff'd en banc, 461 F.2d 1171 (5th Cir. 1972); Kennedy Park *748 Homes Assoc., Inc. v. City of Lackawanna, New York, 436 F.2d 108 (2nd Cir. 1970).
7. Where, as here, the state and county officials, plus all professional educators who have considered the school district arrangement in St. Louis County, have recommended the exact opposite course of action from that followed in the creation and maintenance of the Kinloch district, no state interest has been shown in continuing such an arrangement. United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). The defendants have failed to overcome the evidence of racial discrimination.
8. The State cannot escape responsibility for the racial discrimination disclosed in this case or the obligation to correct the effects of such discrimination by neatly compartmentalizing the authority and responsibilities of its various instrumentalities and then contending that no single instrumentality is wholly responsible for the unlawful segregation or has the power to correct the unlawful segregation. The constitutional rights of children not to be discriminated against on grounds of race, color, or national origin can neither be nullified openly and directly, nor nullified indirectly through evasive schemes for segregation, whether attempted ingeniously or ingenuously, and every law or resolution of the legislature, every act of the executive, and every decree of the state courts, which, no matter how innocent on its face, seeks to subvert the enjoyment of a constitutional right is unconstitutional and null. Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939); Cooper et al., Members of Bd. of Dir. of Little Rock, Ark., Independent School District v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Bush v. Orleans Parish School Board, 190 F.Supp. 861 (E.D.La.1960), aff'd sub nom., City of New Orleans v. Bush, 366 U.S. 212, 81 S.Ct. 1091, 6 L. Ed.2d 239 (1961); Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Poindexter v. Louisiana Financial Assistance Commission, 275 F.Supp. 833 (E.D.La.1967) aff'd per curiam, 389 U. S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968).
9. The state and county defendants have the authority to reorganize the school districts of Missouri to better accomplish the educational policies and responsibilities of the state. Their exercise of that authority to exclude the Kinloch district, because of the race of its resident students, from reorganization plans of school districts in St. Louis County resulted in the maintenance of separate neighboring school districts, one black and the other virtually all-white, in violation of the Fourteenth Amendment. Lee v. Macon County Board of Education, 448 F.2d 746 (5th Cir. 1971); Haney v. Sevier County Board of Education, Arkansas, 410 F.2d 920 (8th Cir. 1969); Turner v. Warren County Board of Education, 313 F.Supp. 380 (E.D.N.C.1970), aff'd sub nom. Turner v. Littleton-Lake Gaston School District, 442 F.2d 584 (4th Cir. 1971); United States v. State of Texas, 321 F. Supp. 1043 (E.D.Tex.1970); 330 F. Supp. 235 (E.D.Tex.1971), modified and aff'd, 447 F.2d 441 (5th Cir. 1971), cert. denied, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972); Clark v. Board of Education of Shelbyville, Kentucky, 350 F.Supp. 149 (E.D.Ky.1972). In the one instance in 1949, when Kinloch district was included in a reorganization plan, the electorate defeated the proposal on referendum. Whether the inclusion of Kinloch in the 1949 reorganization proposal is considered an effort by the state to correct the long-standing education disparities (Cf. Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256), which effort was nullified by the electorate, or whether the rejection of the proposal by the electorate is considered as action which frustrated and made more burdensome the future attainment of their constitutional rights by the black citizens of Kinloch (Cf. Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 *749 L.Ed.2d 616 (1969); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed. 2d 830 (1967); Lucas v. Forty-Fourth General Assembly of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964), the referendum action violated the Fourteenth Amendment. United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). The state and county defendants cannot justify their exclusion of Kinloch district from reorganization plans on the grounds that the other school districts would oppose such a reorganization.
"[I]t should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." Brown, 349 U.S. at 300, 75 S. Ct. at 756.
10. In any event, the cumulative effect of the actions of the state and local defendants has been the creation, operation, support, and general supervision by the State of Missouri of a small school district which is unconstitutionally segregated and whose students are denied an equal educational opportunity. United States v. State of Texas, 321 F.Supp. 1043 (E.D.Tex.1970); 330 F.Supp. 235 (E.D.Tex.1971), modified and affirmed, 447 F.2d 441 (5th Cir. 1971), cert. denied, 404 U.S. 1016, 92 S.Ct. 675, 30 L. Ed.2d 663 (1972).
11. In Brown v. Board of Education, 349 U.S. 294, 300-301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1954), the Supreme Court contemplated:
"[that conversion to a unitary system would raise] . . . problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems."
And the Court charged the states with the responsibility of taking steps to resolve such problems. 349 U.S. at 301, 75 S.Ct. 753. Here, the evidence shows that there are numerous educationally sound and administratively feasible alternative methods for reorganizing the school districts of St. Louis County which would eliminate the unconstitutional segregation and denial of equal educational opportunities caused by the present arrangement. Whether the present arrangement of school districts is considered a vestige of the previously state-imposed dual school system or a continuing effect of racially discriminatory state action, the defendants are obliged to take the necessary steps to establish a constitutional system of school operation, and they bear a heavy burden of justification for continuing the present ineffective method of school district organization. Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). In fact, the only reason offered for failing to reorganize the school districts so as to desegregate Kinloch district was the opposition of the surrounding white school districts. But, as previously indicated, that is no justification for continuing the present arrangement of school districts, which is both unsound and unconstitutional. Monroe v. Board of Commissioners of City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).
12. Since the defendants have failed to comply with their constitutional obligations, this Court has not only the power but the duty to enter a decree which will correct the continuing effects of past discrimination as well as bar like discrimination in the future. Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). The primary responsibility for insuring a *750 constitutional structure of public education is the state's, therefore, it is appropriate for the Court to order the state and other defendants to develop and implement a plan which will "achieve the greatest possible degree of actual desegregation, taking into account the practicalities of that situation." Davis v. Board of School Commissioners of Mobile County, 402 U.S. at 37, 91 S.Ct. at 1292 (1971); Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1954). An appropriate order will be entered requiring such a plan to be developed to include provisions to protect the interests of faculty, staff, and students in the implementation of the plan. Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969). The Court will retain jurisdiction to hold necessary hearings and enter a final desegregation plan and thereafter to insure an orderly transition to operation under the final plan, and to see to it that future actions do not perpetuate or re-establish the dual system. Brown v. Board of Education, 349 U.S. at 301, 75 S.Ct. 753; Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. at 21, 91 S.Ct. 1267.