491 F.Supp. 351 (1980)
Craton LIDDELL et al., Plaintiffs,
v.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MISSOURI et al., Defendants.
No. 72-100C(C).
United States District Court, E. D. Missouri, E. D.
May 21, 1980.
Supplemental Findings of Fact and Conclusions of Law June 3, 1980.
*352 Joseph McDuffie, William P. Russel, St. Louis, Mo., for plaintiffs Craton Liddell et al.
John H. Lashly, Paul B. Rava, Lashly, Caruthers, Thies, Rava & Hamel, St. Louis, Mo., for defendants Daniel L. Schlafly et al.
Thomas A. Connelly, City Counselor, St. Louis, Mo., for City of St. Louis.
J. Kent Lowry, Asst. Atty. Gen., Jefferson City, Mo., for State of Missouri.
Robert J. Koster, King, Yusman, Koster & Buechner, St. Louis, Mo., for Mary Puleo et al.
Anthony J. Sestric, St. Louis, Mo., for Janice Adams et al.
William E. Caldwell, Richard B. Fields, Ratner & Sugarmon, Memphis, Tenn., Charles H. Staples, St. Louis, Mo., Thomas I. Atkins, New York City, Gen. Counsel, NAACP, for plaintiffs-intervenors Caldwell.
Dempster Holland, Newton McCoy, St. Louis, Mo., for Evelyn Hasty.
Craig M. Crenshaw, Jr., Drew S. Days, III, Asst. Atty. Gen., Civil Rights Div., Dept. of Justice, Washington, D.C., Joseph B. Moore, Asst. U.S. Atty., St. Louis, Mo., for the U.S.
Charles W. Kunderer, Klutho, Cody & Kilo, St. Louis, Mo., for City of St. Louis.
Charles R. Oldham, St. Louis, Mo., for teacher Local.

ORDER
MEREDITH, District Judge.
This cause came to be heard pursuant to the remand, opinion, and order of the United States Court of Appeals for the Eighth Circuit handed down on March 3, 1980. After conferences with all counsel and a hearing on the Desegregation Plan filed by the defendant Board of Education of the City of St. Louis on May 2, 1980, and the Court, having considered the positions and objections of the parties, being duly advised in the premises, with findings of fact and conclusions of law to follow, it is hereby:

ORDERED, ADJUDGED AND DECREED that:
1. The defendant Board of Education of the City of St. Louis ("Board") shall not discriminate on the basis of race in the operation of its public schools.
2. The proposed plan of school desegregation submitted by the defendant Board on May 2, 1980, amended on May 8, May 12, and May 15, 1980, is hereby approved, with the modifications required by this Order, for implementation at the commencement of the 1980-81 school year. The Board is ordered to immediately undertake all steps necessary to the smooth and efficient implementation of the plan and shall operate its schools in accordance with the said Desegregation Plan and the further directions contained in this Order. No changes shall be made in the plan without the prior approval of this Court.
3. The defendant Board is hereby directed to keep the Adams school open and operating during the 1980-81 school year as a grade K-8 school. On or before January 1, 1981, the Board shall prepare and submit to the Court a proposal for the future use of the Adams school which includes a cost analysis for any renovation which may be necessary and an evaluation of the efforts necessary to maintain the Adams school as a stably integrated facility.
4. The Board's desegregation budget, as set forth in the Plan, is approved subject to the requirement that continued efforts be made to reduce the actual costs of implementation, but without impairing the quality of the Plan's components.
5. With respect to that part of the desegregation budget pertaining to pupil transportation costs, the Board and the State defendants are directed to investigate further ways to reduce the actual costs of pupil transportation and report to the Court on these efforts by June 16, 1980, with due regard being given to the safety of the children and the quality of service.
*353 6. The defendant Board is authorized and directed to transfer the sum of $4,668,000 from its debt retirement account to the building and renovation account to be applied to such building modifications as are needed to expand the magnet schools and achieve the conversion to the grade configuration described in the Desegregation Plan.
7. The State of Missouri is ordered to fund one-half of the cost of implementing and operating the Board's Desegregation Plan; in no event shall the State be required to pay more than $11,076,206 which is one-half of the Desegregation budget herein approved by the Court for the school year 1980-1981. In the subsequent years, as long as the Plan remains in effect, the State shall pay one-half of the cost of desegregation, subject to such adjustments as the Court may deem necessary or proper. The sum ordered to be paid herein will include the additional dollars for transportation requested in the Desegregation budget. Payments shall be made in four equal installments at the same time as regular payments. No payment by the State for this purpose shall be made from the school Foundation Program. Any amounts overpaid will be refunded to the State or credited on the next payment. Payment by the State to the Board of Education of the City of St. Louis for the costs of the Desegregation Plan shall be in addition to the payments heretofore made by the State to the said Board, as well as any increase in those sums as the Board would have received absent this Order. The State is directed to report to the Court by July 1, 1980, the amount of funds available and when they will be paid.
8. The defendant Board is applying to the United States Department of Education for funds under ESAA which will be used to offset the cost of certain components of the Desegregation Plan. The said Department of Education is required and urged to expedite the processing of these applications of the Board in order to assist the Board in complying with the mandate of the Eighth Circuit and the requirement therein stated that the Plan be implemented no later than the beginning of the 1980-81 school year. The Department is requested to report about its action hereunder by July 1, 1980.
9. The defendant Board shall continue the study of the feasibility of curriculum improvements to improve the quality of education throughout the system.
10. The defendant Board shall continue to study and evaluate the compensatory and remedial educational programs described in the Desegregation Plan and shall recommend for approval by the Court such modifications and improvements as will appear advisable and proper to achieve the goals stated by the appellate court.
11. No inter-or intra-district permissive transfer shall be permitted which will increase the segregated nature of either the sending or receiving school.
12. The State defendants, the United States, and the St. Louis Board of Education are ordered and directed as follows:
a) To make every feasible effort to work out with the appropriate school districts in the St. Louis County and develop, for 1980-81 implementation, a voluntary, cooperative plan of pupil exchanges which will assist in alleviating the school segregation in the City of St. Louis, and which also insures that inter-district pupil transfers will not impair the desegregation of the St. Louis school district ordered herein, and submit such plan to the Court for approval by July 1, 1980.
b) To develop and submit to the Court by November 1, 1980, a plan for the consolidation or merger and full desegregation of the separate vocational educational programs operated by the Special District of St. Louis County and the school district of the City of St. Louis, for implementation in the 1981-82 school year.
c) To develop and submit to the Court by November 1, 1980, a suggested plan of inter-district school desegregation necessary to eradicate the remaining vestiges of government-imposed school segregation in the City of St. Louis and St. Louis County.

*354 d) To develop and submit to the Court by November 1, 1980, in conjunction with the Community Development Agency of the City of St. Louis, a suggested plan for insuring that the operation of federally-assisted housing programs in the St. Louis metropolitan area will facilitate the school desegregation ordered herein.
e) To develop and submit a plan to the Court by July 1, 1980, which expands programs and schools so that all the schools in the City of St. Louis may be eligible for Title I funding for the year 1980-81 under Title I of the U. S. Elementary and Secondary Education Act of 1965.
13. The defendant Board shall assign its faculty and staff in accordance with the following provisions:
All principals, teachers, and other certificated staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for black students or white students. Commencing with the 1980-81 school year, and continuing yearly thereafter for the period inclusive of 1984-1985, the Board shall assign the staff described above so that the ratio of black to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the teachers and other staff, respectively, in the entire school system. For the purpose of this provision, "substantially the same" means within plus or minus five percentage points of the respective ratio in the entire school system or two individuals, whichever is more.
The same criteria shall apply to non-certificated personnel.
The Board shall, to the extent necessary to carry out its Desegregation Plan, direct members of its staff, as a condition of continued employment, to accept new assignments.
14. On October 30, 1980, on March 31, 1981, and on the same dates annually thereafter until further order of the Court, the Board shall file with the Court a report setting forth the following information:
(a)(i) The number of students by race enrolled in the school district;
(ii) The number of students by race enrolled in each school of the district;
(iii) The number of students by race enrolled in each classroom in each of the schools in the district as well as the race of the teacher in each such classroom.
(b)(i) The number of full-time teachers by race in the district;
(ii) The number of full-time teachers by race in each school in the district;
(iii) The number of part-time teachers by race in the district;
(iv) The number of part-time teachers by race in each school in the district.
(c) Descriptions of the requests and the results which have accrued, by race, under the majority to the minority transfer provision which is a part of the Plan.
(d) Statement of the number of permissive transfers granted since the Plan became effective, the race of the students who were granted such transfers, and the school district to which the transfers were allowed.
(e) Brief description of any present or proposed construction or expansion of facilities.
(f) Statement whether the Board has sold or abandoned any school facility, equipment, or supplies having a total value of more than $500.00 since the Plan became effective.
15. All construction of new schools, additions to old schools, closing of existing schools, sales or leases, shall be submitted to this Court with notice given to all parties, and shall not be carried out without prior approval of this Court.
16. A broadly based Monitoring Committee of citizens residing in the City of St. Louis will be appointed by the Court to assist in the implementation of the Desegregation Plan, providing an ongoing review, reporting all the aspects of the Plan, identifying aspects requiring special attention and making recommendations to the Board *355 with regard to any such matter. The Monitoring Committee will have full access to the Board and to the Court and shall report to the Court on a regular basis.
17. Dr. Gary Orfield, who has assisted so well this Court in connection with the Desegregation Plan, shall continue to assist this Court as its expert with regard to the implementation phase and further will provide assistance to the Monitoring Committee and to the parties particularly in connection with the plan of inter-district cooperation and the development of a vocational program for city and county combined. The expenses and fees for these services shall be paid one-half by the State and one-half by the Board.
18. Defendant Board shall seek the assistance of civic groups, including business, labor, religious, and parents' groups, in informing the community of the essential facets of the Desegregation Plan and enlisting the maximum public support of all sections of the community to insure a smooth and effective operation of the Plan. All persons concerned shall be guided by the consideration that the widest acceptance by the community is essential to the success of the Plan.
19. The Court will not grant any stay of this Order.
20. The Court retains jurisdiction of this action to ensure that the provisions of this Order are effectively being carried out.

SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW
These Findings of Fact and Conclusions of Law supplement the Court's Order of May 21, 1980, filed on that day.

Findings of Fact
1. On March 3, 1980, the United States Court of Appeals for the Eighth Circuit issued an opinion reversing the opinion filed by this Court, remanding it to this Court and ordering a plan of desegregation to be filed within 60 days. The opinion of the Court of Appeals placed primary responsibility for drawing this plan with the Board of Education of the City of St. Louis. This Court immediately requested the attorneys for all parties to meet together on Thursday, March 13, 1980, and to meet with the Court on Friday, March 14, 1980, in order to consider ways and means of implementing the mandate of the U. S. Court of Appeals.
2. The Court met with the attorneys on Friday, March 14, 1980, after they met together on March 13, and appointed a group of 20 citizens of the City of St. Louis, 10 white and 10 black, to form a Citizens Committee from those names suggested by the lawyers. The Court selected as chairman of the Citizens Committee Edward T. Foote, Dean of the Law School of Washington University. This Committee worked without compensation. The Citizens Committee met on March 21, 1980, with the Court and with Milton Lewis, Regional Director of the Community Relations Service of the Department of Justice; Dr. Albert L. Walker, Assistant Commissioner of Education of the Department of Education of the State of Missouri; and Dr. Robert Wentz, Superintendent of the Board of Education of the City of St. Louis, all of whom had members of their staffs present, and Dr. Gary Orfield, who had been appointed as the expert by the Court. All members of the Citizens Committee and Dr. Orfield had been sent copies of the opinion of the United States Court of Appeals for the Eighth Circuit in this cause and were familiar with its contents. The Committee met in constant session for five days a week from March 21, 1980 through May 1, 1980. There was a constant flow of information from the School Board's committee and from Dr. Orfield to the Citizens Committee. This Committee had a great input on the Plan drawn by the School Board, received input from the community, and did an excellent job. The Committee selected Charles Brown to serve as vice-chairman and Anita Bond to serve as secretary.
3. The defendant Board of Education of the City of St. Louis, within a few days of the receipt of the opinion, order, and mandate of the appellate court, concluded that no review of the appellate court decision *356 should be sought. It established an internal committee of 14 administrators, teachers, and other personnel who remained in constant session until the final plan was filed on May 2, 1980. In the course of their investigation and assembling of data, five members of the internal committee visited the school districts of Milwaukee, Louisville, and Columbus, Ohio. Tentative plans were filed from time to time between March 3 and May 2, 1980. Copies of these plans were furnished to Dr. Gary Orfield, the Citizens Committee, and were published in the daily newspapers and the television media for the purpose of informing the citizenry. The School Board Plan was unanimously approved by all twelve members of the Board of Education of the City of St. Louis. Dr. Orfield approved the Plan with minor recommendations, and on May 8, 1980, the Board of Education of the City of St. Louis accepted Dr. Orfield's recommendations and filed an amendment to the Plan on May 8, 1980.
4. The Citizens Committee filed a report with the Court. Some of its suggestions had been adopted by the School Board; some had not. Dr. Orfield filed a report with the Court. The United States, which had intervened as a party plaintiff, supported the amended Desegregation Plan.
5. The Board of Education of the City of St. Louis considered all the plans described in the opinion of the Court of Appeals and concluded that neither the Stolee nor the Colton Plan was appropriate in the St. Louis situation. The Court of Appeals found that based upon the evidence, an interdistrict remedy has the best chance of permanently integrating the schools in the metropolitan St. Louis area. All parties and this Court generally agree with this proposition.
6. This Court has heretofore made a finding in its original opinion that implementing the Stolee Plan would result in an all black system in a few years. Because of this finding the Eighth Circuit did not require that the Stolee Plan be implemented.
7. The Colton Plan was found by the Eighth Circuit to be in part constitutionally defective. In addition, its application to the enrollment composed of 76 percent black and 24 percent white students would allow black students to spend only a few years in an integrated school with the balance of their education required to be spent in segregated schools. This Court finds, based on the evidence, that transferring students from an integrated school to a one-race school, as advocated in the Colton Plan, would have a detrimental effect upon students and would be educationally unsound. It also would fail to achieve effective desegregation.
8. The Orfield approach was found to be permissible by the Eighth Circuit. The School Board also selected certain features of the Colton approach in its Plan. The Court of Appeals in its opinion found that a school with a black enrollment between 30 and 50 percent shall be considered to be integrated and that with the system which has a ratio of 76 percent black and 24 percent white students this compels the continuing existence of some all black schools.
9. The cost of implementing the Desegregation Plan in the St. Louis public schools is estimated to be $22,152,413 for the 1980-81 school year. This figure is in excess of the normal budget which exceeds $125,000,000 annually plus $33,000,000 received from federally funded programs. Based on the testimony before the Court, the Court finds the additional $22,152,413 to be a reasonable figure for the cost of implementing this Plan.
10. The State of Missouri, through the Department of Education, testified that under its regulations it pays 80 percent of transportation costs. However, the maximum cost it will pay is 125 percent of the average cost throughout the entire State of Missouri, which includes rural schools, and the cost of transportation in the City of St. Louis is about twice the cost of transportation in other places in the state. Under these circumstances, the amount the State of Missouri will pay for transportation is considerably less than half of the cost of transportation in St. Louis. For example, *357 the cost of transporting a student every day throughout the school year in St. Louis is $515 per year. The statewide average is $147 per student per year. The State will only pay 125 percent of $147. The cost in Kansas City is $249 per student per year. This Court in its Order has requested the State of Missouri, the St. Louis School Board, and the United States to examine transportation costs to see if they can be reduced and to report to the Court by June 16, 1980.
11. The components of the Desegregation Plan are educationally sound and satisfy the requirements of the opinion, decree, and mandate of the Court of Appeals with regard to integrating the enrollment in the schools through the adoption of clustering in the elementary schools and by reassignment and transportation in the high schools. Existing magnet schools will be continued and six new magnet schools added. A variety of specialty programs will be offered to all students in the district. Development and enrichment programs, which will include remedial and compensatory features but will not be limited to students with low achievement test scores, will be offered in those schools in North St. Louis which cannot be integrated because of heavy imbalance in the racial composition of the enrollment in the district. Further, the Plan sharpens the provisions applicable to permissive transfers and encourages broader use of this technique, commits the efforts of the Board to seek and develop interdistrict plans of voluntary cooperation with school districts of St. Louis County, adopts a "Singleton" type faculty assignment plan, provides for regular reporting to the Court, monitoring of the Plan, and citizen participation in the implementation stage. The Court finds that these provisions comply with the requirements of the mandate of the Eighth Circuit and that they constitute a sound and reasonable response to that mandate. Indeed, all of the improvements in the instructional area, including the conversion to middle schools, will assist in remedying the educational deprivations which resulted from the dual system which the Court of Appeals found to have existed. In addition, these improvements in the quality of education will encourage students, both black and white, to remain in the system.
12. The State of Missouri, which together with State officials and the State Board of Education was joined as a defendant, is jointly and severally liable with the defendant Board for the costs pertaining to the Desegregation Plan. The State of Missouri, which prior to 1954 mandated school segregation, never took any effective steps to dismantle the dual system it had compelled by constitution, statutory law, practice and policy. The State of Missouri is liable for the de jure segregation which existed in the St. Louis Public Schools. Thus, as recognized in the Court of Appeals opinion, it is within the equitable power of this Court to require the State to pay a portion of the costs of desegregation. In the light of the financial position of the district, the nature of the violations committed by the parties, and all the appurtenant circumstances, it is appropriate that the State be required to pay one-half of the total costs to implement the Desegregation Plan for the public schools of the City of St. Louis.
13. For the school year 1980-81 these desegregation costs are estimated to amount to $22,152,413 and the State share of these costs is $11,076,206. Any part of said sum of $11,076,206 which is not expended by the Board for the purposes of the Desegregation Plan should be refunded by the Board to the State. Further investigation should be undertaken by the defendants to determine whether the cost of pupil transportation may be reduced without adverse effect upon the safety of the children and the quality of service. The State should have discretion in the determination of the source or sources of the State funds with which to pay its share of the costs except that no payment for this purpose should be made from the school Foundation Program, which is essential to the operation of all school districts throughout the state.
14. The other 50 percent should be paid by the Board from the following sources: The Board has funds available in the building service fund which was established for *358 the retirement of bonds heretofore issued for the purpose of purchasing, erecting, furnishing and repairing school buildings. As of June 30, 1980 there will be in said fund an excess balance which will make it possible, without jeopardizing the district's ability to meet its bond repayment objectives, to apply the sum of $4,668,000 to the payment of the building modifications which are needed to expand the magnet and other alternative schools and achieve the conversions to the grade configuration described in the Desegregation Plan. The sum necessary to provide the remaining funds needed should consist of the federal funds which the Board should receive under the ESAA program and under other federal programs pertaining to providing financial assistance for the desegregation of the public schools.
15. The Board has received substantial funding under Title I of the Elementary and Secondary Education Act of 1965 (20 U.S.C. § 241a et seq.) for the last several years. Title I is a program of federal financial assistance which provides funding for remedial programs in schools with concentrations of students from economically disadvantaged backgrounds. During the 1979-80 school year 118 of the 134 schools in the St. Louis school system were eligible for Title I programs. The 16 schools which did not have sufficient concentrations of low income students to qualify under Title I were all located in effectively all-white areas of the City. Under the Board's Plan each of these sixteen schools will either be closed or desegregated.
It is important that students and schools previously eligible for Title I programs not be deprived of the benefits of those programs because of the implementation of a school desegregation plan. Every effort should be made to maximize the number of Title I eligible schools within the statutory framework of Title I.
16. Considering the school closings, number of students transported, distance of transportation, and other facets of the Desegregation Plan of the Board taken as a whole under all the circumstances present here, the burden of desegregation will be borne as equally as possible.
17. The existing dual system of vocational education split between the City and St. Louis County is neither educationally sound nor administratively efficient. These systems, established in 1965 and 1967, are further evidence of the continuing failure of the State to take any effective measures to disestablish the dual system in the State. The State has the power to effectively merge these systems. Its failure to exercise that power is part and parcel of its failure to take affirmative steps to eradicate root and branch the dual system it once formally mandated.
18. As the Court of Appeals noted, "many factors ... including actions of the state and federal government, have intensified racial segregation in North St. Louis." It is critical that future actions in the housing area of all government bodies, federal, state and local, facilitate and not hamper school desegregation. Given the past history of federally assisted housing programs in the St. Louis area, it is necessary that a specific plan to facilitate and not hamper school desegregation be developed by the appropriate government bodies.
19. The Adams school shall remain open and operating for a period of one year during the 1980-81 school year as a grade K-8 school on an experimental basis.

Conclusions of Law
1. In the pending proceedings on remand of this cause pursuant to the opinion, decree, and mandate issued by the United States Court of Appeals for the Eighth Circuit on March 3, 1980, the issue for adjudication by this Court is whether or not the Desegregation Plan submitted by the defendant Board of Education of the City of St. Louis on May 2, 1980, as amended, meets the requirements set by the appellate court in its aforesaid opinion, decree, and mandate.
2. Upon examination of the Desegregation Plan filed by the Board as aforesaid, and having considered the report of the Court's expert, Dr. Gary Orfield, filed *359 herein on May 5, 1980, and the evidence adduced by the parties, it is the conclusion of this Court that the said Desegregation Plan, as amended, meets the requirements of and complies with the opinion, decree, and mandate of the Eighth Circuit and is sound and feasible under the circumstances. It should also be noted that the United States, which intervened in this cause at the request of this Court pursuant to the suggestion of the appellate court, and took the position of plaintiff intervenor, directly supported the Board's Desegregation Plan, as amended, as being in compliance with the mandate of the Eighth Circuit.
3. The Court recognizes that the Board's Plan, although it conforms to the Court of Appeals' mandate, will not provide a fully desegregated education for every black child in the school system. However, the Board's Plan, developed under the Orfield approach, holds the promise of providing the "greatest possible degree of actual desegregation, taking into account the practicalities of the situation," Davis v. Board of School Commis., 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971). Included in the "practicalities" of this case is the current absence of suburban school districts amongst the parties of record. No suburban school district is now a party to this case and none can be ordered to participate until its rights have been adjudicated.
4. The Board in its plan has proposed a "Singleton" type faculty assignment plan. See Singleton v. Jackson Mun. Sep. Sch. Dist., 419 F.2d 1211, 1217-18 (5th Cir. 1970). Such plans have been universally recognized as an appropriate method of eliminating the racial identifiability of school facilities in a desegregation school system.
5. The post-Brown Fourteenth Amendment obligation of a State that has operated a legally imposed racially dual school system is clear. See, e. g., United States v. State of Missouri, 363 F.Supp. 739, 747 (E.D.Mo.1973), aff'd in relevant part, 515 F.2d 1365 (8th Cir. 1975), cert. denied, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975):
A state, such as Missouri, which has in the past operated a racially dual system of public education, pursuant to state constitutional and statutory requirements [and continuing policy, practice, custom and usage] is, and has been since 1954, under an additional constitutional obligation to take such affirmative measures as are necessary to disestablish that dual system and eliminate the continuing vestiges of that system. (Emphasis added.)
Upon the decision in Brown II, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), it became the constitutional duty of the defendant State of Missouri to obliterate all vestiges of such state-imposed segregation. This obligation, as fleshed out in Brown II's progeny, required the state "to do more than abandon its prior discriminatory" conduct. Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 538, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (Dayton II). Rather, the State, and, upon its default, now the Court, has the duty "[to] eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). See also Dayton II, supra; Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 458-61, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II); Swann v. Charlotte-Mecklenberg Bd. of Educ., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and companion cases; Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and companion cases. As the Supreme Court squarely held in Milliken II, supra, the Fourteenth Amendment requires responsible "state officials ... to take the necessary steps `to eliminate from the public schools all vestiges of state-imposed segregation.'" 433 U.S. at 289-90, 97 S.Ct. at 2762.
6. In sum, the State defendants stand before the Court as primary constitutional wrongdoers who have abdicated their affirmative remedial duty. Their efforts to pass the buck among themselves and to other state instrumentalities must be rejected:

*360 The State cannot escape responsibility for the racial discrimination disclosed in this case or the obligation to correct the effects of such discrimination by neatly compartmentalizing the authority and responsibilities of its various instrumentalities and then contending that no single instrumentality is wholly responsible for the unlawful segregation or has the power to correct the unlawful segregation.
United States v. State of Missouri, supra at 748. Since "[t]he primary responsibility for insuring a constitutional structure of public education is the state's, ... it is appropriate for the Court to order the state" to affirmatively participate in remedial efforts, id. at 749, including the provision of funding, to the extent necessary, for the desegregation efforts ordered by the Court. See, e. g., Milliken II, supra; United States v. Missouri, supra; Evans v. Buchanan, 447 F.Supp. 982 (D.Del.), aff'd, 582 F.2d 750 (3d Cir. 1978), cert. denied, ___ U.S. ___, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980).
7. The State of Missouri defendants have been found and held liable with the Board of Education of the City of St. Louis for the segregated conditions in the St. Louis public schools. The State should bear an appropriate share of the cost of implementing the Desegregation Plan. Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). See also, United States v. State of Missouri, supra; Evans v. Buchanan, supra, and United States v. Board of School Commissioners, 456 F.Supp. 183, 191-192 (S.D.Ind.1978), aff'd, No. 78-1800 (7th Cir., April 29, 1980).