654 F.Supp. 334 (1987)
Craton LIDDELL, et al., Plaintiffs,
v.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, MO., et al., Defendants.
No. 72-1100C(5).
United States District Court, E.D. Missouri, E.D.
January 30, 1987.
Joseph McDuffie and William P. Russell, St. Louis, Mo., for Michael C. Liddell, et al.
Wayne C. Harvey, St. Louis, Mo., Michael Middleton, Columbia, Mo., for Earline Caldwell, et al.
Craig M. Crenshaw, Jr. and Jeremiah Glassman, Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., for U.S.
James J. Wilson, City Counselor, St. Louis, Mo., for City of St. Louis.
Kenneth C. Brostron, Stephen Cooper, St. Louis, Mo., for The Bd. of Educ. of the City of St. Louis, et al.
Anthony J. Sestric, St. Louis, Mo., for Ronald Leggett, Collector of Revenue.
Michael J. Fields, Robert Presson, Asst. Attys. Gen., Jefferson City, Mo., for State of Missouri, et al.
Joseph R. Neimann, Eric M. Schmitz, Timothy R. Kellett, St. Louis, Mo., for Special School Dist. of St. Louis County.
George J. Bude, St. Louis, Mo., for Hancock Place, Brentwood, Bayless and Clayton.
Robert G. McClintock, St. Louis, Mo., for Ladue.
Kenneth V. Byrne, St. Louis, Mo., for Valley Park.
Henry D. Menghini, Robert J. Krehbiel, St. Louis, Mo., for Lindbergh and Affton.
Francis L. Ruppert, Terry Farris, St. Louis, Mo., for Mehlville.
Donald J. Stohr, R.J. Robertson, James W. Erwin, St. Louis, Mo., for Parkway.
Robert W. Copeland, St. Louis, Mo., for Webster Groves and Rockwood.
Bertram W. Tremayne, Jr., St. Louis, Mo., for Kirkwood and University City.
Darold E. Crotzer, Jr., St. Louis, Mo., for Normandy, Wellston and Jennings.
John Gianoulakis, St. Louis, Mo., for Ritenour and Pattonville.
Richard H. Ulrich, James F. Sanders, St. Louis, Mo., for Maplewood and Richmond Heights.
Frank Susman, St. Louis, Mo., for Ferguson-Florissant.
Edward E. Murphy, Jr., Garry Seltzer, St. Louis, Mo., for Riverview Gardens.
Robert P. Baine, Jr., St. Louis, Mo., for Hazelwood.
*335 Andrew J. Minardi, Joseph D. Ferry, St. Louis, Mo., for St. Louis County, et al.
Bruce S. Feldacker, St. Louis, Mo., for St. Louis Teachers Union, Local 420.
Charles Werner, St. Louis, Mo., for Missouri Nat. Educ. Ass'n.
Shulamith Simon, St. Louis, Mo., amicus curiae.

MEMORANDUM AND ORDER
LIMBAUGH, District Judge.
This matter is before the Court regarding the Metropolitan Coordinating Committee's (MCC) recommended plan for Phase III of the 12(b) Vocational Education plan, L(1017)86. Several parties and committees have filed responses to the proposal. L(1027)86-Desegregation Monitoring and Advisory Committee; L(1030)86-City Board; L(1031)86-Caldwell plaintiffs; L(1035)86-United States; L(1048)86-Special School District, and L(1054)86-State of Missouri. In addition, the United States has filed a motion to expand the MCC membership, L(1040)86, and the Special School District has filed a motion for approval of Phase III, L(1080)86.
The MCC filed its Phase III proposal in response to this Court's order L(746)86 approving, with modifications, Phase II. The Court emphasized a need for an extensive analysis of the present vocational-education system with regard to the desegregation process. Program revisions and alternatives to the present vocational-education system are necessary and the Court decided that the MCC be given another opportunity to present a revised extension of the 12(b) plan. Phase III is the MCC's proposal for revising the 12(b) vocational-education plan beyond the 1986-87 school year.
Phase III proposes changes in five significant areas:
1. The MCC membership is to be expanded to eight (8) members; five members representing the St. Louis Public Schools, the Department of Elementary and Secondary Education (State) and the Special School District and three members (Court appointments) representing labor, education and business interests. The new MCC would relinquish responsibility for programming and site selection to the City Board and Special School District while retaining responsibility only for program monitoring and evaluations and recommendations.
2. Overall racial balance by the 1990-91 school year in each of the four schools is to be 55% white and 45% black with a 15% variance.
3. Implementation of a four-year program at O'Fallon known as TECH FOUR, a three-year early entry program for disadvantaged and handicapped students (all schools), a three-year supplemental program for ungraded handicapped students (county schools only), and a one-year tenth grade pre-vocational preparatory program (all schools).
4. All two-year programs will be available on both a full-day and half-day basis except for Cosmetology and Health Services Assistant.
5. In one or two-year programs where a waiting list of ten or more students of one race exists, an additional section will be opened at a site where the students will aid in reducing racial isolation. The MCC has also elected to postpone considering the closing of one or more schools.
The Phase III proposal is unacceptable to the Court. It fails to address the continuing problems of severe underenrollment and substantial program duplication. Instead of investigating alternatives to the on-going programs, the MCC again focuses upon a four-year program at O'Fallon. Racial goals are altered as a "means" of achieving desegregation instead of strategies developed to achieve the present goals. A large number of programs are still duplicated among the schools. Finally, the MCC seeks to expand its membership while greatly reducing its functions. The MCC wants to abdicate its responsibility for programming and site selection, retaining only an evaluation function. Essentially, it would be another "monitoring" committee assigned to the 12(b) plan.
*336 During the summer of 1986, this Court held a series of Executive Sessions designed to address current problems with the desegregation plans and changes that may be warranted in the near future. One of these sessions was devoted exclusively to the 12(b) vocational-education plan. Several MCC members, along with educators, other committee members and directors, attorneys representing parties, and other persons interested in the vocational-education field, attended this session. It was obvious from the opinions expressed and data presented, that the 12(b) plan (in its present form) was not meeting the needs of students. Alternatives and changes were discussed. Although the Court found the Executive Session to be quite enlightening, little of anything discussed or changes proposed at the session are reflected in the Phase III proposal.
The Court paid close attention to the opinions expressed and changes proposed at the Executive Session. It has also conferred with Amicus Simon regarding public attitude and societal needs regarding vocational-education. Two reports published by the Special School District have been scrutinized. One report is by the Long-Range Planning Commission, Board of Education, Special School District of St. Louis County (December, 1985) and the other report is by the Subcommittee on Vocational-Education for the Citizen's Commission, Special School District of St. Louis County (October, 1985). Both of these reports are extremely informative and insightful as to current and future problems within the vocational-education system in general and in the St. Louis metropolitan area. The Court has reviewed the MCC's progress reports beginning for school year 1980-81 and the reports submitted by the Bi-Racial Monitoring Team and the Vocational Education Advisory Committee. As a comparison to a similar situation, the Court has examined the Wilmington, Delaware Vocational-Education Plan (which the Court understands is currently being implemented).
After assimilating this information and other material in the voluminous record of this 15-year old case, it is apparent that problems in implementing the 12(b) plan effectively reflect the general demise in the area of vocational high school education. Vocational pupil enrollments everywhere have been steadily declining over the last several years. Technical training has become highly specialized and requires constant updating. School districts cannot compete with the modern technical training programs available throughout the St. Louis metropolitan area. The St. Louis Community Colleges offer a vast selection of vocational courses and degreed programs. Technical training is readily obtainable through an ever-increasing number of private vocational-technical educational facilities. Private industry and organized labor offer interested persons many apprenticeship and training programs.
Department of Elementary and Secondary Education enrollment figures and the MCC's Progress Reports clearly show declining enrollments in the four vocational-technical high schools. See, Appendix A (attached). Since the 1977-78 school year, O'Fallon's enrollment has decreased from 2,508 to 504; North County  1,281 to 596; South County  978 to 369, and West County[1]  341 to 289. These declining enrollments have severely hampered desegregation within the vocational-technical high schools. Although some improvement has been made at O'Fallon, only North County demonstrates any semblance of racial balance. Pursuant to the MCC's First Semester Progress Report for 1986-87, L(1139)86, North County has a racial balance of 42% black and 58% white; O'Fallon  82% black and 18% white; South County  16% black and 84% white, and West County  34% black and 66% white.
Another disturbing fact is the revelation that despite declining enrollments, students are being denied access to the vocational-technical high schools. Evidently in the quest to obtain and maintain racial goals in *337 the classroom, students may be denied enrollment in a program solely on the basis of race. This certainly was not the intended purpose of the 12(b) plan. The 12(b) plan (as well as the other desegregation plans) was created not only to desegregate the vocational-technical high schools, but also to provide better vocational educational opportunities for minority students. The Court wholeheartedly agrees with the Caldwell plaintiffs that "[t]he denial of opportunities in order to achieve a racial `goal' may serve to achieve that goal, but does a great disservice to the underlying goal of any educational program and an important goal of our effort  the provision of quality educational opportunities to interested students." Caldwell plaintiffs' Memorandum in Response to MCC's Phase III proposal, p. 3. The current policy of racial goals to insure integration is jeopardizing the education of many students, black and white.
These observations, coupled with the MCC's reluctance to take decisive action regarding the 12(b) plan's shortcomings, has prompted the Court to address this matter directly. Declining enrollment, duplication of programs and waiting lists of minority students forces this Court to take radical steps in overhauling the 12(b) plan. Changes are necessary in order that a quality educational program in a desegregative atmosphere be carried out.
The unfortunate reality of the present situation is that a surplus of facilities exists. None of the schools' enrollments have ever met or come close to its building capacity in the last ten years. The combined building capacity, according to the Department of Elementary and Secondary Education is 6,700 students. See, Appendix B (attached). The present total vocational-education student population is approximately 1,700. See L(1139)86. There is nothing to indicate that the current downward trend in enrollments will reverse itself. It is ludicrous to spend money for staffing and equipping four grossly under-enrolled schools. It is no longer fiscally prudent to keep four schools open as vocational-technical high schools. Limited resources will be more effectively utilized on a lesser number of schools. After serious consideration, it is this Court's decision that South County and West County vocational-technical high schools be closed and no longer considered as educational facilities within the purview of the 12(b) vocational-education plan. The Court believes that new efforts toward providing a quality vocational education in an integrated setting can be better concentrated in the two remaining schools, O'Fallon and North County. It is also hoped that a reduction in operating costs will manifest into better programming suitable to meet changing student and societal needs.
The Court does not make this decision easily. The ramifications of closing two schools has been duly considered. This decision necessitates the relocation not only of large amounts of equipment, but also a great number of people. Jobs may be lost. However, this Court, the City Board, the State and the Special School District have a constitutional obligation to provide quality educational opportunities to all students in an integrative atmosphere. The 12(b) plan in its present form has failed to do this. The Court believes that part of the problem stems from a surplus of facilities requiring limited resources to be used inefficiently.
Regarding teacher and staff concerns, the Court proposes the following staffing plan to be implemented as part of the 12(b) plan as modified by this Court:
Certified Teacher Reduction
1. MCC and appropriate support will develop staffing plan for each site by job title and certification requirements.
2. The Personnel Division of each district will prepare a seniority list by certification in current position of current teaching staff at each of the four sites.
3. The MCC will merge the seniority lists and re-assign staff to O'Fallon Tech and North Tech based on the projected staffing requirements. Staff will be assigned to their current employing district whenever possible. Regardless of assignment, teachers will remain employees of their current district, but would *338 have the option of employment transfer if assigned to the other district.
4. Certified teachers who are displaced by the site reduction will be placed in a pool. Special School District and St. Louis Public Schools will give preference to staff in this pool when filling positions outside of MCC sites. These teachers would also be eligible to "bump" other teachers within their employing district based on each district's current policy.
5. Teaching vacancies which occur after the implementation of this plan will be filled by the district in which the vacancy occurs, utilizing the teacher/administrator pool when appropriate.
Site Administrator/Support Staff Reduction
1. MCC and appropriate support staff will develop an administrative staffing plan for each site by job title and certification. This plan would include principal, assistant principal, guidance, placement and other professional support staff.
2. The Personnel Division of each district will prepare a seniority list by certification in current position of the current administration and support staff of each of the four sites.
3. The MCC will merge the seniority lists and re-assign staff to O'Fallon Tech and North Tech based on the projected staffing requirements. Staff will be assigned to their current employing district whenever possible. Regardless of assignment, staff will remain employees of their current district, but would have the option of employment transfer if assigned to the other district.
4. Certified administrators/support staff who are displaced by the site reduction will be placed in a pool. Special School District and St. Louis Public Schools will give preference to staff in this pool when filling positions outside of MCC sites. These staff members would also be eligible to "bump" other staff members within their employing district based on each district's current policy.
Non-Certified Staff
(Secretaries, Janitors, etc.)
1. The MCC and appropriate support staff will develop a noncertified staffing plan for each site by job title. This plan would include all non-certified staff, i.e. secretaries, janitors, cooks, etc.
2. The Personnel Division of each district will then assign appropriate staff, based on the MCC staffing plan, utilizing current employees located at MCC sites, and the appropriate labor agreement/Board policy for each group. If Special School District continues to operate West County Tech and South County Tech as school sites, persons displaced by the site reduction will be given preference for new positions at these sites.
The relocation and disposal of equipment will be managed in the following manner:
Relocation Costs
Based on paragraph 12 of the Phase II Plan, the State, City Board and Special School District will be responsible for the relocation costs incurred by this site reduction. Relocation costs will be divided equally among the three parties.
Disposal of Excess Equipment
The MCC and appropriate staff will perform an equipment review for each program based on current equipment available at the four sites and equipment needs of programs under the reduced site structure. Equipment not deemed necessary by the MCC may be disposed of by the purchasing district based on current Board policy.
Expendable Tools/Supplies
Relocated/Programs
Currently programs which are relocated across district lines will transfer all expendable tools and supplies to the new site upon the completion of the 1986-87 school year.

*339 Current Special School District's programs which under the new plan will be offered at both O'Fallon Tech and North Tech or North Tech only will transfer all expendable tools and supplies to North Tech at the end of the 1986-87 school year.
Budget Concerns
Beginning with the 1987-88 school year, the district housing the program will be responsible for all operating costs relating to each program with the exception of certified staff as previously noted.
Another change the Court finds necessary is the elimination of specific "racial goals." It is the Court's fervent belief that careful programming should naturally create a racial balance in the two remaining schools. Racial goals within a program is not always the answer to a difficult situation. Instead of promoting desegegation as a natural accommodation of races within a school, racial goals in the 12(b) plan, and perhaps in the entire voluntary plan, have served only to limit access to the classroom for white and black students. Efforts should be directed at making programs attractive to students in the minority, instead of meeting racial quotas. Juggling the numbers does not change the reality of the situation. This Court is committed to providing quality educational opportunities to all students in the metropolitan St. Louis area. The elimination of racial goals within the classroom does not mean that the schools are free to become segregated again. The MCC retains its responsibility to assign students to each class in such a manner that will still provide desegregation in the school as a whole. The Court does not object to an overall "goal" of 55% white/45% black at each high school as a challenge to be met. However, since quotas at the program level have been eliminated, there is no need to change the variance.
The Court agrees to the requested expansion of the MCC membership to eight, and also finds the Caldwell plaintiffs' request to include a ninth member representing the plaintiffs' interest to have merit. Furthermore, the Court finds the "tie-breaking" vote allotted to the State to be an improper allocation of power under the circumstances. Therefore, the Court will approve the MCC's request for expansion, along with the United States' Motion to Expand MCC Membership with the amendment that the MCC expand to nine (9) members to include the members designated in the Phase III proposal and an additional member representing the Liddell and Caldwell plaintiffs. All nominations for new members shall be made on or before March 2, 1987.
The Court does not look favorably upon the shift in responsibility of the MCC. There is no need for simply another monitoring committee regarding the 12(b) Plan. The MCC's responsibilities, therefore, will remain the same as before.
Like the Phoenix rising from its ashes, the issue of a four-year program at O'Fallon again is before the Court. This issue is presently on appeal. Until such time as the Eighth Circuit Court of Appeals directs otherwise, this Court will continue to disapprove a four-year program at O'Fallon.
The Court realizes that implementing the 12(b) Plan as now modified by the Court will entail some difficulty. However, these changes are necessary if the 12(b) Plan is to operate as the constitutional remedy it was originally intended. The Court strongly encourages all parties and committees to work together to overcome the hardships these changes may bring so that the students can begin to receive the quality education they deserve.
Accordingly,
IT IS HEREBY ORDERED that
1. The Court approves the attached Vocational-Education Plan, as modified by this Court and referred to as Phase III, for the Board of the City of St. Louis and the Special School District of St. Louis County, Missouri for school years 1987 through 1991. The Court adopts the modified Phase III Plan as its own.
2. The Special School District of St. Louis County, Missouri, the City Board and *340 the State of Missouri are ordered to implement the Phase III Plan in accordance with the attached Implementation Schedule as modified by this Court. Implementation shall proceed forthwith.
3. The filing of Progress Reports by the MCC shall continue as before.
4. All previous orders of the District Court or the Eighth Circuit, not inconsistent herewith, remain in full force and effect.
5. The Memorandum of Understanding referred to in paragraph 4 of the modified Phase III Plan shall be filed in this Court no later than March 2, 1987.
6. The present appointment of the members of VEAC shall remain intact until further notice of this Court.
7. This Court retains jurisdiction of this action for all purposes including the entry of such additional orders as may, from time to time, be necessary and proper.

APPENDIX A

 DESE AND MCC ENROLLMENT FIGURES
 O'FALLON NORTH SOUTH WEST
 School
 Year Black White Total Black White Total Black White Total Black White Total
 1977-78 2241 267 2508 100 1181 1281 52 926 978
 1978-79 2141 178 2319 108 1224 1332 57 962 1019
 1979-80 2531 122 2653 61 1660 1221 81 996 1077
 1980-81 2472 101 2573 104 1210 1314 62 939 1001
 1981-82 2341 71 2412 154 1069 1223 93 811 904
 1982-83 791 302 1093 186 862 1048 142 673 815 74 267 341
 1983-84 776 76 852 178 518 696 113 457 570 122 222 344
 1984-85 493 52 545 164 477 641 102 414 516 105 222 327
 1985-86 294 66 360 173 443 616 118 413 513 109 245 354
 1986-87 412 92 504 252 344 596 60 309 369 99 190 289
 Based on historical data as collected each school year and/or MCC Progress Reports.
 See, L(1139)86; L(569)85; H(3439)84; H(2764)83; H(1568)82. These figures do not include
 special education students.

APPENDIX B

 ESTIMATED BUILDING CAPACITY
 SCHOOL[*] HIGHEST[**]
 DESE OFFICIALS ENROLLMENT
 NORTH 1800 1600 1327 (1979)
 O'FALLON 2500 2400 3001 (1963)
 SOUTH 1600 1300 1014 (1979)
 WEST 800 600 502 (1985)

 PHASE III VOCATIONAL EDUCATION PLAN FOR THE BOARDS OF
 EDUCATION OF THE CITY OF ST. LOUIS AND THE SPECIAL
 SCHOOL DISTRICT OF ST. LOUIS COUNTY
1. Primary governance of the consolidated vocational technical school programs[*] of the Board of
 Education of the City of St. Louis (hereinafter "City Board") and the Board of Education of the
 Special School District of St. Louis County (hereinafter, "Special District") will remain vested in
 each of the two existing Boards of Education, respectively. This vested authority is the policy
 decision-making responsibility of the respective boards including, but not limited to, the
 operation of the respective programs, employment of staff, development of personnel and
 appropriation of funds to meet each districts' needs.
 The plan is continuing in nature and the period of the Phase III Plan will be for four years.
*341
2. There will be established a nine-member Metropolitan Coordinating Committee, (hereinafter
 "Committee"), composed of two staff persons from St. Louis Public Schools (hereinafter
 "SLPS"), two staff persons from the Special School District (hereinafter "SSD"). The chief
 administrative vocational officer and another staff member in each district will be selected to
 serve on this Committee. Selection will be made by the Boards of the respective districts. A
 fifth member will be appointed by the Missouri State Board of Education and will function as a
 voting member. The State board representative has a primary responsibility for seeing that the
 desegregation requirements of this plan are met. Three additional members, an educator, a
 business leader, and a labor leader will be appointed by the Court upon recommendations of the
 parties. It is recommended that all members be selected based on their expertise, availability to
 function as a committee member, and the ability to exercise independent review and analysis.
 These three members shall be devoid of any relationship to the City Board, Special School
 District or State which would influence their opinion. The ninth member shall represent the
 interests of the Liddell and Caldwell plaintiffs. Court approval is not required for the
 appointment of the plaintiffs' representative. The term of membership shall be for the duration
 of the plan. Removal of any representative may only be done with the approval of the Court
 upon motion of a party or resignation of a member.
 The nature of this plan and the formation of a Committee for vocational education in the
 Metropolitan St. Louis area could require professional assistance. Therefore, a small but
 adequate budget should be established to hire consultants. The State will provide the funds for
 consultants.
3. The responsibilities of the Committee include, but are not limited to all planning activities and
 decisions that are a direct result of this plan and necessary to its administration such as:
  Determination and location of programs and offerings;
  Student recruitment, selection criteria, and assignment;
  Program review, evaluation and revision as needed;
  Review budgets and make recommendations as needed;
  Development and location of any new program, schools or program sites;
  Recommendation for any alternative use of existing facilities;
  General program administration, operation and maintenance.
 The Committee will elect a chairperson and a secretary. The chairperson will be responsible for
 convening the Committee. The Committee will be responsible for keeping a complete record of
 proceedings and communicating decisions and other information to the appropriate parties.
 Dr. Ralph Beacham will continue to act as Executive Director and serve as chief administrative
 officer to carry out the procedures and programs developed by the Committee. He will remain
 an ex-officio, non-voting member of the Committee. The cost of the Executive Director will be
 paid by the two districts and the State Department of Elementary and Secondary Education in
 three equal shares.
 Matters such as time, dates and places of meeting can be determined at the initial meeting of
 the Committee.
4. The Committee, in conjunction with the two Boards and with such consulting help as the
 Committee deems necessary, will revise as necessary the Memorandum of Understanding to be
 entered into by each respective Board. Such Memorandum will provide operational guidelines
 under which the Committee will function with respect to, but not limited to, such items as:
 Teacher assignment;
 Teacher recruitment for vacancies;
 Teacher rules and regulations;
 Teacher grievance procedures;
 Teacher evaluation procedures;
 Student application and selection procedures;
 Student discipline procedures;
 Student grievance procedures;

*342
 Program development, assessment, & revision procedures;
 Budget and financial process, procedures, and commitment for programs;
 Staff development and training;
 Transportation;
 Legal services;
 Processes for administrative reorganization; and
 Determination and location of programs, services and activities.
 A revised Memorandum of Understanding, upon approval, will be submitted to the Court as an
 addendum to this plan.
5. Significant recruitment activities for the consolidated vocational technical programs will be
 cooperatively undertaken by the committee and respective Boards to assure the achievement of
 the racial balance goals projected. Recruitment will include open houses, mass mailings to
 parents of the ninth and tenth graders in the metropolitan area, feature newspaper stories,
 school visits, etc.
 The funding of development of recruitment materials and methods shall be provided by the
 State.
6. The present membership of the two-member, Bi-Racial Monitoring Team (hereinafter BRMT)
 will remain intact. If either or both members choose to resign, replacements will be appointed
 by the Court, based on recommendations of the Committee and the parties. The BRMT shall
 consist of experts in vocational education who are in no way connected with the Districts. The
 BRMT will conduct two on-site visits of no less than three eight-hour days each when school is
 in session during each school year. The BRMT will be charged with the responsibility of
 assessing the degree to which the plan is successful and will make recommendations to the
 Committee where appropriate. The BRMT will report to the Court and to the respective boards
 any situations, conditions, or problems which appear to impede successful plan implementation
 which the Committee is unable to correct or solve. The experts appointed by the Court under
 this paragraph shall be compensated in the same manner as in prior years.
 At the request of the BRMT, the Executive Director will provide part-time statistical auditing
 services to assist the BRMT in its monitoring function relative to enrollments, student programs,
 etc.
7. The Committee will, as needed, use the services of all existing vocational advisory committees,
 which are bi-racial and reflect a cross section of the community including representatives from
 business, industry and unions, to provide citizen input, assessment and advice related to each
 vocational program.
8. It is the goal of the plan to have at each of the technical schools a racial balance of 55% white
 and 45% black with a 10% variance in the beginning of the 1990-91 school year.
 For duplicated programs (those which are offered at more than one site) students will be given
 their first or second choice program, but such program choice may be at a school other than the
 student's first choice for the purpose of maintaining racial balance. A student who does not
 wish to accept a site other than their first choice is free to remain in their local high school.
9. In the 1990-91 school year, the total number of county students placed in City Board and Special
 District programs may not exceed the total slots available and approved for juniors and seniors
 in the Special District technical school and other developed sites and the total number of City
 Students placed in slots available and approved for juniors and seniors at O'Fallon and other
 developed sites. Within this closed system, however, these numbers may change as total
 program slots in either district are increased or decreased equitably. It is the goal of both
 Districts to significantly increase vocational education programs by either expanding or contracting
 offerings, based on need, to the extent that an equal number of additional or reduced
 slots will be allocated to the City Board and the Special District, and that new programs will
 follow the racial balance guidelines set down.
10. The funding of transportation of city pupils transferring to the county technical school and/or
 county pupils transferring to the city technical school shall be provided by the State.
 No fee for vocational training will be charged by one district to the other for the duration of this
 plan.

*343
11. The funding of equipment for new unduplicated programs will be provided by the State except
 to the extent that funds of either district have already been earmarked for such new programs.
 Wherever possible, unduplicated programs will be developed from existing equipment, and the
 Committee will recommend allocation of such programs between the two districts so that
 neither district is burdened with such program equipment cost unfairly. Where existing
 equipment is used, the state will be responsible only for the costs due to relocation and
 modification of the equipment or buildings, after the initial relocation and modification of
 equipment or buildings as necessitated by the reduction of facilities.
12. Parity of program quality will be essential to attract students and to operate on a non-tuition
 basis. The Committee will recommend to each district and/or to the Court the improvement or
 upgrading of all aspects of any program or facility found to be detrimental to recruitment
 objectives by the Committee.
 No increased costs of the City board attributable to the achievement of parity between
 vocational education programs of the City Board and those of the Special School District shall
 be paid by the Special District. Similarly, no increased costs of the Special District attributable
 to the achievement of parity between the vocational education programs of the City Board and
 those of the Special District shall be paid by the City Board.
 In the event that either Board is unable to fund any increased costs from current revenues
 including its desegregation funds or from other conventional sources, such as local funds,
 foundation aid, state and federal vocational aid and state transportation reimbursement, upon
 certification by the Committee that such costs and expenses are essential to the implementation
 of this plan, either Board shall apply to the Court for such appropriate orders as may be
 necessary to secure additional funds essential for such purpose.
13. Teachers will be encouraged to accept reciprocal visiting professorships in vocational education
 between districts, and to develop opportunities for team teaching. The districts would provide a
 one-step salary incentive for teachers who transfer voluntarily to the other District if the
 transfer decreases racial concentration. Specific details regarding teacher staffing are previously
 outlined in the District Court's accompanying order and memorandum. Specific programming
 will be enumerated in the annual implementation schedule.
14. The Court will review the quarterly reports made by the Committee on progress made toward
 the implementation of this plan. An assessment will be made, pursuant to Phase III, during the
 1990-91 school year so that planning may begin for Phase IV, as necessary, in a timely fashion.
15. The implementation schedule enunciated in this plan is not intended as limiting. If goals can be
 achieved earlier than indicated, nothing in this plan is intended to preclude such result.
 IMPLEMENTATION SCHEDULE YEAR SEVEN 1987-88
 The following will be accomplished in cooperation with the Special School District, St. Louis
Public Schools, and Missouri Department of Elementary and Secondary Education, in accordance
with the Vocational Education Plan and the Memorandum of Understanding as approved by the
Court.
 1. Continue and refine cooperative placement services.
 2. Continue and refine cooperative recruiting activities.
 3. Monitor facilities and activities to insure parity between and among the technical schools.
 4. Review the operation of each vocational program and report to the operating district and the
Court the results of each evaluation and any improvements that are recommended including whether
the program should be expanded, redirected, placed on probation, terminated or relocated.
 5. The following programming will be implemented by the districts:
 A. New Programming
 1. A three-year early entry program for disadvantaged and handicapped students,
 full-day, at North County Tech and O'Fallon Tech.
 2. A three-year supplemental program for ungraded handicapped students, full-day
 at North County Tech and O'Fallon Tech.
 3. A one-year 10th grade vocational preparation program, full-day, at North
 County Tech and O'Fallon Tech.

*344
 B. Expanded Programming
 1. All two-year programs will be available on both a full-day and half-day basis
 with the exception of Cosmetology and Health Services Assistant.
 2. In one or two-year programs where a waiting list of ten or more students of one
 race exists, an additional section will be opened at a site where the students will aid in
 reducing racial isolation.
 C. Phased Out Programming
 1. Welding, full-day, West County Tech.
 2. Consumer Electronic Products Tech, full-day, O'Fallon Tech.
 3. Sheet Metal, full-day, O'Fallon Tech.
 4. City Forestry, one-year, North Tech.
 D. Programming Title Changes
 1. Medical Office Assistant to Health Services Assistant.
 E. Consolidation of Programming
 1. Merge Engineering Drafting and Architectural Drafting into "Drafting".
 F. On-Going Programming
 (All programs are two-year unless otherwise noted; * indicates a one-year program and
 *** indicates a three-year program).
 1. Accounting O'Fallon Tech
 2. Aeromechanics O'Fallon Tech
 3. Air Conditioning North Tech
 4. Airframe/Powerplant O'Fallon Tech***
 5. Auto Body North, O'Fallon
 6. Auto Parts/Machinist O'Fallon Tech
 7. Auto Mechanics North, O'Fallon
 8. Building Services North, O'Fallon
 9. Chemical/Industrial Lab O'Fallon Tech
 10. Child Care North, O'Fallon
 11. Clerical O'Fallon Tech
 12. Commercial Art North, O'Fallon
 13. Communications Equipment Rep. O'Fallon
 14. Community Based Banking O'Fallon Tech*
 15. Computer Based Technology O'Fallon Tech
 16. Computer Data Processing North, O'Fallon
 17. Construction Carpentry O'Fallon Tech
 18. Cooperative Marketing O'Fallon Tech*
 19. Cosmetology North, O'Fallon
 20. Culinary Arts O'Fallon Tech
 21. Custodial Housekeeping Mgmt. North
 22. Data Entry O'Fallon Tech
 23. Diesel Mechanics North
 24. Drafting North O'Fallon
 25. Dry Cleaning O'Fallon Tech
 26. Electrical Trades O'Fallon Tech
 27. Electronics North, O'Fallon
 28. Graphic Arts O'Fallon Tech
 29. Health Services Asst. North, O'Fallon
 30. Ind. Cooperative Educ. O'Fallon, North*
 31. Industrial Machine Repair O'Fallon Tech
 32. Industrial Marketing O'Fallon Tech
 33. Machine Shop North
 34. Metal Processing O'Fallon Tech
 35. Ornamental Horticulture North
 36. Plumbing O'Fallon Tech
 37. Pre-Engineering O'Fallon Tech

*345
 38. Printing Technology North
 39. Public Service North
 40. Secretarial O'Fallon Tech
 41. Small Engines North
 42. Welding North
 43. Woodwork Design/Mfg. O'Fallon Tech

NOTES
[1] West County was first opened in the 1982-83 school year.
[*] Capacity is based on 20-22 students per vocational section.
[**] Includes special education students.
[*] This includes O'Fallon Tech and North County Tech high schools only.