Craton **LIDDELL**, et al.

v.

The **BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI**, et al.

The **BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI**, Appellant,

v.

The **STATE OF MISSOURI**; Arthur Mallory, Commissioner of Education of the State of Missouri, in his official capacity; The State of Missouri Board of Education; John Ashcroft, Governor of the State of Missouri; William Webster, Attorney General of the State of Missouri; Wendell Bailey, Treasurer of the State of Missouri; Stephen C. Bradford, Commissioner of Administration of the State of Missouri; the State of Missouri Board of Education and its members.

Erwin A. **Williamson** (President), Jimmy Robertson (Vice-President), Grover A. Gamm, Delmar A. Cobble, Dale M. Thompson, Donald W. Shelton and Robert Welling, Appellees,

United States, Appellee. (Two Cases)

Craton **LIDDELL**, et al.

v.

The **BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI**, et al.

The **BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI**, Appellee,

v.

The **STATE OF MISSOURI**; Arthur Mallory, Commissioner of Education of the State of Missouri, in his official capacity; The State of Missouri Board of Education; John Ashcroft, Governor of the State of Missouri; William Webster, Attorney General of the State of Missouri; Wendell Bailey, Treasurer of the State of Missouri; Stephen C. Bradford, Commissioner of Administration of the State of Missouri; the State of Missouri Board of Education and its members.

Erwin A. Williamson (President), Jimmy Robertson (Vice-President), Grover A. Gamm, Delmar A. Cobble, Dale M. Thompson, Donald W. Shelton and Robert Welling, Appellants.

Craton LIDDELL, et al.

v.

The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI, et al.

SPECIAL SCHOOL DISTRICT OF ST. LOUIS COUNTY, MISSOURI,
Appellant,

v.

The STATE OF MISSOURI; Arthur Mallory, Commissioner of Education of the State of Missouri, in his official capacity; The State of Missouri Board of Education; John Ashcroft, Governor of the State of Missouri; William Webster, Attorney General of the State of Missouri; Wendell Bailey, Treasurer of the State of Missouri; Stephen C. Bradford, Commissioner of Administration of the State of Missouri; the State of Missouri Board of Education and its members, Erwin A. Williamson (President), Jimmy Robertson (Vice-President), Grover A. Gamm, Delmar A. Cobble, Dale M. Thompson, Donald W. Shelton and Robert Welling, Appellees,

United States, Appellee.

Craton LIDDELL, et al.

v.

The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI, et al.

The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI, and Special School District of St. Louis County, Missouri, Appellees,

v.

The STATE OF MISSOURI; Arthur Mallory, Commissioner of Education of the State of Missouri, in his official capacity; The State of Missouri Board of Education; John Ashcroft, Governor of the State of Missouri; William Webster, Attorney General of the State of Missouri; Wendell Bailey, Treasurer of the State of Missouri; Stephen C. Bradford, Commissioner of Administration of the State of Missouri; the State of Missouri Board of Education and its members, Erwin A. Williamson (President), Jimmy Robertson (Vice-President), Grover A. Gamm, Delmar A. Cobble, Dale M. Thompson, Donald W. Shelton and Robert Welling, Appellants.

Nos. 86–1511, 86–1565, 87–1275, 87–1301 and 87–1355.

United States Court of Appeals, Eighth Circuit.

Submitted May 4, 1987.

Decided June 8, 1987.

As Modified June 9, 1987.

Kenneth C. Brostron, St. Louis, Mo., for the Bd. of Educ. of the City of St. Louis.

Jordan Cherrick, St. Louis, Mo. (argued), for the Special School Dist.

Robert Presson, Atty. Gen.'s office, Jefferson City, Mo., for the State of Mo.

Frank D. Allen, Jr., Washington, D.C., for appellee the U.S.

William Russell, St. Louis, Mo., for Liddell parties.

Before HEANEY, McMILLIAN and FAGG, Circuit Judges.

HEANEY, Circuit Judge.

At issue in this appeal is the fate of a recent district court plan for the further integration of the vocational schools of the St. Louis metropolitan area.[1] The district court decided that South Tech and West Tech should be closed and that all vocational classes should be taught at North Tech in the county or O'Fallon in the city. It assigned programs to each school, revised racial goals, established the conditions of transfer, and entered orders relating to the financing of the new plan. It also denied the request of the City Board to re-establish a four-year vocational program at O'Fallon. The Special School District, the City Board, the State of Missouri appeal. The United States filed no separate appeal but submitted a brief in which it argues that the district court should be affirmed in part and reversed in part. It expresses no opinion as to certain issues. (No party contests the closing of West Tech.)

We affirm the district court's decision to deny the City Board permission to re-establish a four-year vocational school at O'Fallon. We direct that an evidentiary hearing be held before a final decision is made to close South Tech and to consolidate all vocational education at one or more county vocational technical schools and O'Fallon. We remand to the district court with directions to conduct such a hearing and thereafter to enter an appropriate order.

We set forth herein the factors which we believe to be important to that decision.

We affirm the decisions of the district court to require the State of Missouri to pay all interdistrict transportation costs, to allocate the costs of relocation of equipment to the State, the Special School District, and the City Board, and to expand the powers of the Metropolitan Coordinating Committee. In this connection, the district court must be satisfied that each school district can finance its share of these costs without adversely affecting the desegregation programs which have heretofore been mandated by this Court. Those desegregation programs include the magnet schools, smaller classes, and remedial and compensatory programs in the all black schools. If the district court is not satisfied that this can be done, it must enter funding orders consistent with this Court's prior decisions.

**Background**

In 1980, the United States District Court for the Eastern District of Missouri found that the vocational high schools in metropolitan St. Louis, operated by the Board of Education of the City of St. Louis (City Board) and the Board of Education of the Special School District of St. Louis County (Special School District), were segregated. *See Liddell v. Board of Education,* 491 F.Supp. 351 (E.D.Mo.1980).[2] It found the State of Missouri had established and maintained a dual vocational system for the purpose of keeping the Special School District's vocational high schools in St. Louis County predominantly white and the City's vocational school (O'Fallon) predominantly black. *Id.* at 358.

The district court ordered the State and the City Board "[t]o develop and submit to the Court by November 1, 1980, a plan for the consolidation or merger and full desegregation of the separate vocational educational programs operated by the Special

---

**1.** This plan is embodied in two orders: *Liddell v. Board of Education,* No. 72–100C(5), slip op. (February 25, 1986) (designated as L(746)86); *Liddell v. Board of Education,* 654 F.Supp. 334 (E.D.Mo.1987).

**2.** For a general history of the St. Louis desegregation dispute, see *Liddell v. State of Missouri (Liddell VII),* 731 F.2d 1294, 1298–1301 & n. 1 (8th Cir.) (en banc), *cert. denied sub nom. Leggett v. Liddell,* 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984), and cases cited therein.

School District of St. Louis County and the school district of the City of St. Louis, for implementation in the 1981–82 school year." *Id.* at 353. The State appealed to this Court. We affirmed. *Liddell v. Board of Education (Liddell IV)*, 667 F.2d 643, 651 (8th Cir.1981).

On remand, the State and the Special School District resisted consolidation.[3] Thereafter, the United States, the State, the Special School District, the City Board, and other parties entered a consent decree which adopted a plan, commonly referred to as the "12(b) plan," for voluntarily desegregating the vocational schools.[4] The district court included that plan as part of its June 11, 1981, order. The order also provided that the State, as the primary constitutional violator, had a responsibility with respect to funding the plan. *See* order of June 11, 1981, H(181)81 at 2, 9–10. The State and a parents group appealed the order (and other associated orders). The State argued that it should not be expected to provide any funding for the plan, and the parents group urged this Court to require that the two school districts be merged or consolidated.

In *Liddell V*, we approved the 12(b) plan as adopted by the district court. 677 F.2d at 632–38. We noted that if the plan did not result in the integration of the vocational schools, the district court could either order a complete merger, modify the plan, or adopt another plan. *Id.* at 636. We affirmed the district court holding that funding orders could be imposed against the State. *Id.* at 638.

Under the 12(b) plan, the Special School District and the St. Louis School District remained separate entities responsible for

the operation of their respective schools. *See* 12(b) Plan, H(133)81, *supra* at 1. Accordingly, the Special School District would continue to operate North County Technical High School (North Tech), South County Technical High School (South Tech), and, upon its opening in 1982, West County Technical High School (West Tech). The City Board would continue to operate O'Fallon Technical High School (O'Fallon).

The Metropolitan Coordinating Committee (MCC) was formed and given the authority to administer the 12(b) plan. The MCC consisted of five members, two appointed by the City Board, two appointed by the Special School District, and one appointed by the State. *See id.* at 1. The responsibilities of the MCC included and currently include: establishing the vocational school curricula; determining where each program could be offered; recruiting students; reviewing programs; developing its budget; developing and locating new vocational programs; and recommending alternative uses for facilities. *See id.* at 2; 654 F.Supp. at 335.

The 12(b) plan required that programs be allocated so as to achieve a racial balance of 65% white and 35% black (with a variance of 10%) in the vocational schools by 1985–86, the fifth year of the 12(b) plan. *See* 12(b) Plan *supra* at 3. The 12(b) plan also provided for review by the district court in the 1985–86 year to "assess whether the goals of this plan have been met." *See id.* at 6.

**The Present Controversy**

On May 15, 1985, the MCC submitted a plan for the 1986–87 school year called "Phase II." That plan provided for the

---

**3.** Of the plans submitted to the district court, only the City Board's contemplated full consolidation of the two school districts. *See Liddell v. Board of Education*, No. 72–100C(4), slip op. at 3–4 (June 11, 1981) (designated as H(181)81).

**4.** The Caldwell plaintiffs-intervenors and the City of St. Louis also signed the decree. The Liddell plaintiffs approved in substance the consent decree, but objected to a jurisdictional provision and therefore did not sign it. The black parents group (the Adams group) objected to the consent decree in its entirety. *See Liddell v. Board of Education (Liddell V)*, 677 F.2d 626,

633–34 (8th Cir.1982), *cert. denied sub nom. Missouri v. Liddell*, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 142 (1982). All the parties, except the Adams group, agreed to the vocational plan which the district court "without significant modification" included in its order of June 11, 1981. *See* 677 F.2d at 634. The full name of the 12(b) plan is *The Vocational Education Plan for the Boards of Education of the City of St. Louis and the Special School District of St. Louis County* (May 21, 1981) (designated as H(133)81) (hereinafter cited as *"12(b) Plan"*).

continuation of the 12(b) plan for two more years with certain modifications. These modifications included providing for racial goals of 75% white and 25% black in the Special School District schools and 35% white and 65% black at O'Fallon; requiring the State to pay the costs of interdistrict transportation; and reinstituting a four-year vocational program at O'Fallon.[5] *See* order of February 25, 1986, L(746)86, at 1–2. The district court approved the change in the racial goals, *id.* at 3; agreed to require the State to fund interdistrict transfers, *id.* at 4; but refused to allow the City Board to implement a four-year program at O'Fallon, *id.* at 2–3. The district court also ruled that Phase II would only be in effect for the 1986–87 year. *Id.* at 4.

The district court observed that "the present structure of the MCC inherently subverts any real independent review and analysis." *Id.* at 3. It also stated that the MCC seemed to be ignoring worthwhile suggestions of advisory committees,[6] and, as a result, its proposals lacked in-depth analysis and innovativeness. *Id.* (Observations with which we find ourselves in complete agreement.)

The district court urged the MCC to consider revising course offerings at O'Fallon to attract more white students and to consider closing one of the Special School District vocational schools because of declining enrollment. *Id.* at 4. Finally, it required that changes be made in the structure of the MCC before its next proposal so that the proposal would "reflect autonomous thought devoid of the City Board, Special School District, or State's lobbying interests." *Id.* at 5.[7]

The City Board immediately appealed the portion of the district court's order rejecting the four-year program at O'Fallon. While this matter was on appeal to this Court, the district court considered the MCC's Phase III proposal, a proposal intended to chart the course of the vocational schools through 1991.

In its Phase III proposal, the MCC again recommended that a four-year vocational program be instituted at O'Fallon, *see* 654 F.Supp. at 335, order of January 30, 1987, L(1269)87, at 2, and that the MCC be expanded from five to eight members, with new members representing labor, education, and business interests. *Id.* at 335. The MCC also suggested that it should no longer be responsible for determining what and where specific vocational programs would be offered. Finally, the MCC proposed long-term racial goals of 55% white and 45% black (with a 15% variance) for all vocational high schools by the 1990–91 school year. *Id.* at 335.[8]

On January 30, 1987, the district court entered its order with respect to the Phase III plan. It approved the long term racial goals recommended by the MCC with one exception: It reduced permitted variances for these goals from fifteen to ten percent. *Id.* at 339. The court agreed to expand the membership of the MCC to include repre-

5. The Phase II proposal of the MCC also contained other recommendations regarding program parity and host district fiscal incentives which are not at issue in this appeal.

6. The two advisory committees referred to by the district court are the Vocational Education Advisory Counsel and the Desegregation Monitoring and Advisory Committee.

7. This statement addressed a concern expressed by the United States that "it should be clarified that each member of the MCC should exercise their independent judgment as a member of the MCC to assure that the desegregation requirements of the plan are met and not simply follow the directions of their employer." Response of the United States to the MCC's Proposed Phase II [sic] Vocational Education Plan, L(1035)86, at 6 (August 21, 1986).

8. The Phase III proposal included establishing a three-year early entry program for disadvantaged and handicapped students, a three-year supplemental program for ungraded handicapped students in the Special School District, and a one-year tenth grade pre-vocational preparatory program. It would also require that all two-year programs be available on both a full- and half-day basis except for Cosmetology and Health Service Assistant. Finally, the MCC proposed instituting, in one and two-year programs with waiting lists of ten or more students of one race, an additional section to be opened at one of the schools in order to improve overall school integration. The district court included these programs in its implementation schedule. No party objects to these inclusions.

sentatives from business, labor, and education. It added a ninth member to represent the Liddell and Caldwell plaintiffs. It refused to accept the MCC's proposed changes in its responsibilities observing that to do so would essentially turn the MCC into "another 'monitoring' committee." *Id.* at 335. The district court again rejected the four-year program at O'Fallon. *Id.* at 339.

As in its previous order, the district court criticized the MCC's proposal because it failed to address "the continuing problems of severe underenrollment and substantial program duplication" (programs offered at more than one school). *Id.* at 335. In light of these failures, the district court stated that it was necessary to take "radical steps in overhauling the 12(b) plan." *Id.* at 337. It ordered that South Tech [9] and West Tech be closed (leaving two vocational schools—O'Fallon in the city and North Tech in the county), and that racial goals required for specific programs be eliminated.[10] *Id.* at 337–339. It required relocation costs of equipment to be borne equally by the three parties. *Id.* at 338–339. It empowered the MCC to develop a new "staffing plan" for the two remaining schools. Finally, it determined which programs would be offered at O'Fallon and North Tech.[11]

**9.** On February 9, 1987, the Special School District filed motions to have the district court alter, amend, or stay its order of January 30, 1987, as it pertained to the closing of South Tech. The district court denied the motion to alter or amend, but granted the motion to stay its order to close South Tech until this Court ruled on the matter. *See Liddell v. Board of Education,* 654 F.Supp. 345 (E.D.Mo.1987).

**10.** It apparently had been the consistent practice of the MCC tentatively to allot spaces in each class on a racial basis. It was this consistent practice which the district court intended to stop. *See infra* p. 1459.

**11.** The district court listed the newly assigned programs in its implementation schedule.

**12.** The only contested issue addressed by the district court in the February 25, 1986, order but not addressed in the January 30, 1987, order

## Discussion

We now consider the appeals from the district court orders of February 25, 1986, and January 30, 1987.[12] The City Board appeals the court's denial of the proposed four-year program at O'Fallon, the equal division of the relocation costs, and the decision to expand the MCC's responsibilities to include staff reassignment and reduction. The Special School District appeals the decision to close South Tech. The State appeals the portion of the order requiring it to pay interdistrict transportation costs.[13] We consider sua sponte the district court's decision to eliminate racial goals within each vocational program.

Before addressing the issues raised on appeal, we comment briefly on the 12(b) plan. The plan was adopted in the belief that the parties acting in "the utmost good faith" could voluntarily eradicate the long-standing segregation in the public vocational schools. *See Liddell V,* 677 F.2d at 636. Unfortunately, desegregation has not been achieved, and total enrollment at the vocational schools has plunged.[14] A degree of integration has been achieved at North Tech and West Tech, but little progress has been made towards this goal at either O'Fallon or South Tech.[15] While the staff

is the payment of interdistrict transportation costs.

**13.** The Liddell plaintiffs made a motion to this Court to file its brief out of time. We granted their motion. The Liddell plaintiffs urge this Court to affirm the district court's orders of February 25, 1986, and January 30, 1987, in all respects.

**14.** The district court found that enrollment at the vocational schools has dropped from 4,767 in 1977–78, to 1,758 in 1986–87. (Part of this decline is attributable to the dropping of ninth and tenth grade vocational classes at O'Fallon before the 1982–83 school year.)

**15.** The parties are not in agreement as to the current enrollment. The district court's findings on this issue are set forth in Appendix A to its opinion:

at O'Fallon is integrated, those at the three county schools have remained largely white.

The record contains many explanations of why enrollment has declined and integration has not been achieved. Primary among these are:

1. *The curriculum does not prepare students for work in an economy of constant change and advancement.*

Of the 1985 graduates of the vocational schools, approximately 63% were employed in their areas of specialization, 32% were employed in unrelated areas, and 5% were unemployed. Of the 1986 graduates, 50% were employed in their areas of training, 20% were employed in unrelated areas, and 30% were unemployed. *See* Preliminary Progress Report of MCC, July 15, 1986, L(1001)86, at p. 9. Some study has been done on the current and future needs of employers. *See* Report of Long Range Planning Commission Board of Education, Special School District of St. Louis County, December, 1985, CP(154)87, at p. 11. It is clear, however, that no comprehensive study has been done on occupations of vocational school graduates or on what employers seek in employee vocational training. *See* Eighth Report of the Bi-Racial Monitoring Team, January 31, 1986, L(724)86, at p. 3.

2. *The structure of the MCC prevents it from providing the leadership necessary to create a quality integrated vocational system.*

The MCC's primary responsibility has been to develop programming designed to integrate the vocational schools of the St. Louis area. Even at this task, however, the MCC has largely failed. As the United States Government recognized in its response to the Phase III proposal, the MCC has failed to strategically place attractive programs at the vocational schools to assist in integrating them. *See* Response of the United States to the MCC's Proposed Phase II [sic] Vocational Education Plan, L(1035)86, at pp. 9–10. As long as four years ago, parties were urging the MCC to offer more unduplicated programs, particularly at O'Fallon. In each of its recent orders, the district court expressed displeasure with the MCC's unwillingness to follow suggestions of the court and others. As the court stated, "the present structure of the MCC inherently subverts any real, independent review and analysis." Order of February 25, 1986, L(746)86, at 3.

3. *The facilities are in need of repair and the equipment is outdated.*

Some of the evidence in the record suggests that O'Fallon lags behind the Special School District schools in keeping pace with

| School Year | O'FALLON | | NORTH | | SOUTH | | WEST | |
|---|---|---|---|---|---|---|---|---|
| | Black | White | Black | White | Black | White | Black | White |
| 1977–78 | 2241 | 267 | 100 | 1181 | 52 | 926 | — | — |
| | 89% | 11% | 87% | 13% | 5% | 95% | — | — |
| 1986–87 | 412 | 92 | 252 | 344 | 60 | 309 | 99 | 190 |
| | 82% | 18% | 42% | 58% | 16% | 84% | 34% | 66% |

The United States reports what it considers more accurate figures from the Preliminary Progress Report of MCC of March 31, 1987, L(1250)87, at 1–4:

| School Year | O'FALLON | | NORTH | | SOUTH | | WEST | |
|---|---|---|---|---|---|---|---|---|
| | Black | White | Black | White | Black | White | Black | White |
| 1986–87 | 382 | 87 | 295 | 324 | 105 | 335 | 113 | 166 |
| | 81% | 19% | 48% | 52% | 24% | 76% | 40% | 60% |

It is unnecessary for this Court to determine which set of figures are more accurate. Both sets reveal that O'Fallon and South Tech remain largely segregated, and reveal that a degree of integration has been achieved at North Tech and West Tech.

technological advancements. *See, e.g.*, Report of Vocational Education Advisory Counsel, L(269)85 at p. 4 (June 5, 1985). This may be due in part to a negative image developed during the late 1960's that has not been refurbished. *See id.* at pp. 8–10. If O'Fallon is to attract white students from either the city or the county, the facility must be modernized and the image improved. In addition, the staff must be given the opportunity to keep abreast of changing technology and to introduce that technology to students.[16] *See id.* at pp. 4–5.

### 4. *The transportation system is inefficient.*

The Special School District transportation system has been criticized as being "cumbersome, complex, and expensive." *See* Long Range Planning Commission Report of December, 1985, *supra* at p. 11. If desegregation is to work, students must not encounter unnecessary delays in getting to and from school. Otherwise, they will more likely refuse to attend a school some distance from their home. An efficient transportation system would be even more essential if certain schools are closed.

### 5. *Comprehensive high schools in the county and city have vocational programs which draw students away from the vocational schools.*

A study conducted in 1984 indicated that 3,980 students were enrolled in certain vocational programs not within the MCC's purview and 2,517 metropolitan students took part in two to three hours of vocational programs (in programs similar to those in the vocational high schools). *See* Desegregation Monitoring and Advisory Committee Report, L(351)85, at p. 2 (June 23, 1985). If the area vocational high schools are to survive, they must be given the opportunity to meet the vocational needs of the county and city students with programs that meet the current needs of students. The cooperation of individual school districts should be sought with the goal of encouraging them to discontinue offering competing duplicate programs, lest a separate segregated vocational education system for white students develop in the comprehensive high schools in the county.

### 6. *Recruitment of students has been inconsistent.*

In 1984–85, counselors from the MCC gave presentations to 5,108 prospective students (37% of the metropolitan tenth grade class). In 1985–86, counselors made presentations to only 2,699 prospective students (21% of the metropolitan tenth grade class). *See* Preliminary Progress Report of MCC, July 15, 1986, *supra* at p. 10. The record also reveals that the recruiting effort has been underfunded. Neither the Special School District nor O'Fallon will be successful unless recruiting efforts are enhanced and properly funded.

### 7. *The schools lack extracurricular activities.*

Students have complained that the vocational schools lack extracurricular activities and school spirit. *See, e.g.*, Subcommittee on Vocational Education for the Citizen's Commission, St. Louis County Special School District at pp. 9–10. The record does not indicate that these concerns have been addressed. While the problem is a difficult one, it must be considered as a part of the Phase III program.

We recognize that it will not be an overnight task to solve the problems outlined in the district court's orders and in this opinion. Yet, unless these problems are resolved, the goal of an integrated vocational education system for black and white students in the St. Louis metropolitan area cannot be attained. We are also very much aware of the long history of racial segregation, *see Adams v. United States*, 620 F.2d

---

**16.** The vocational teachers at the Special School District schools received high marks in a 1985 survey of alumni. *See* Report of Subcommittee on Vocational Education for the Citizen's Commission, St. Louis County Special School District, at p. 10 (October, 1985). No formal study of the staff at O'Fallon appears in the record, but nowhere is it listed as a weakness. It seems evident therefore that the vocational teachers, given the right environment and adequate financial support, can provide a quality integrated education.

1277, 1281–84 (8th Cir.) (en banc), *cert. denied,* 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980), and that many parents and students perceive O'Fallon to be the black vocational school and North Tech and South Tech to be the white vocational schools.[17] This history and these perceptions make it all the more necessary that the conditions outlined above be addressed by the district court and the parties in formulating a Phase III plan for the years through 1991.

### The Power of the District Court to Create a Modified Plan

■ We initially examine the 12(b) plan within the context of paragraph 12(b) of the district court's 1981 order. In *Liddell V,* 677 F.2d at 636, we stated that "the district court expressly retained jurisdiction over the vocational education issues and may take appropriate action at any time sua sponte or upon a motion of any party if implementation of the 12(b) plan does not bring about the anticipated results." We added that the district court "after the 1985–86 school year and upon a party's motion after a hearing, 'may either order a complete merger of the vocational programs with a unified governing and taxing structure, modify this plan, or adopt any other plan * * *.' " *Id.* at 636 (quoting paragraph 16 of the 12(b) plan). This language [18] gave the district court the broadest discretion possible to provide a quality integrated vocational education system for the black and white children of the St. Louis metropolitan area.

### Abuse of Discretion Under the 12(b) Plan

We now turn to the question of whether the district court abused its discretion in refusing to permit the City Board to institute a four-year program at O'Fallon; in closing South Tech and West Tech without a hearing; in requiring the parties to share equally the relocation costs resulting from the closings; in empowering the MCC to develop a restaffing plan; in requiring the State to pay the costs of interdistrict transfer students; and in eliminating racial goals in vocational programs.

### The Four-year Program at O'Fallon

The City Board requests that a four-year vocational education program be re-established at O'Fallon. Before the 1981 consent decree, O'Fallon was a four-year vocational school. During the 12(b) plan negotiations, the City Board argued that ninth and tenth grade vocational training should be moved to the comprehensive high schools. *See Liddell V,* 677 F.2d at 636–37; *see also Liddell v. Board of Education,* No. 72–100C(4), slip op. at 1 (May 21, 1981) (designated as H(134)81). As part of the 12(b) plan, the State was to help finance the creation of vocational programs in ninth and tenth grade at the comprehensive high schools. 677 F.2d at 636–37.

■ The City Board advances three arguments in support of the proposed four-year program ("Tech Four"). First, the program will expand vocational education opportunities and improve O'Fallon's im-

---

**17.** This is in part evident from statistics gathered by the MCC which show the following: In 1984–85, of the 1,244 county students applying for vocational education programs, only sixty-four requested O'Fallon and of those only twenty-one were white. In 1985–86, of the 1,275 county students applying for vocational programs, 103 requested O'Fallon and of those only thirty-three were white. In 1986–87, of the 1,258 county students applying for vocational education programs, 153 requested O'Fallon and of those only forty-nine were white. *See* Dr. Joseph Grimes, Affidavit in Support of Special School District's Motion to Alter or Amend, L(1278)87.

In addition, in 1984–85, the MCC assigned forty-seven whites to O'Fallon for desegregation purposes, and of those forty refused to attend O'Fallon. In 1985–86, the MCC assigned sixty-one whites to O'Fallon, and of those forty-nine refused to attend. In 1986–87, the MCC assigned fifty-three whites to O'Fallon, and of those thirty-eight refused to attend. *See id.*

**18.** In addition, as we stated in *Liddell V,* "these considerations are distinct from a more fundamental reality: the broad remedial authority vested in the federal courts under the Supremacy Clause to eliminate proven constitutional violations committed by the state." 677 F.2d at 636 n. 21. In other words, the constitutional violation found in paragraph 12(b) permits the district court to impose any remedy which is commensurate with the violation.

age. We share the district court's skepticism of this claim. There is little or no evidence in the record to support the view that offering primarily academic courses [19] to ninth and tenth graders at O'Fallon would either expand vocational education opportunities or improve O'Fallon's image. We do not dispute that emphasis on academic courses may be proper for ninth and tenth grade students. We simply agree with the district court that the City Board has not established that such schooling could best be accomplished at O'Fallon or that offering such a program will improve O'Fallon's image. We would add that it is extremely difficult to achieve a rational integrated vocational education system for the St. Louis metropolitan area if the Special School District has two-year schools and the city has a four-year school.

Second, Tech Four will increase white enrollment at O'Fallon. There is no support in the record for this view. O'Fallon is a vocational school. If it is to succeed, all concerned must address the problems outlined by the district court in its orders and by this Court in this opinion. The MCC must insist that high quality and relevant programs be offered at O'Fallon, and the City Board must make sure that these programs are properly administered and taught.

Third, the decision to institute Tech Four should be left to the local school board and the MCC because of their expertise in edu-

cational policy. Ordinarily, courts defer to the "reasonable proposals" of a local school board in the establishment of educational policy. *See Morgan v. McDonough,* 689 F.2d 265, 276 (1st Cir.1982) (citing *Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977)). But, there are sound reasons for not doing so here: (1) The MCC simply accepted the City Board's recommendation and agreed that the program should be tried. There is no evidence that it thoroughly reviewed the matter, or made an independent decision with respect to it. As the district court indicated, this practice cannot be permitted to continue. The MCC must be permitted to exercise the responsibility given to it by the district court and this Court. (2) The record does not support the City Board's contention that the decision was an educationally reasonable one.

### The Closing of South Tech

The Special School District claims that the district court denied it due process by ordering that South Tech be closed without holding an evidentiary hearing. It also asserts that the closing would be an abuse of discretion if a hearing had been held.

■ We agree that an evidentiary hearing should be held before a final decision is made to close one or more of the vocational schools operated by the Special School District.[20] To be sure, there is evidence in the

---

**19.** The proposed curriculum includes the following: for the ninth grade: english, science, mathematics, social studies, physical education, technical information skills, and career orientation; and for the tenth grade: english, fine arts, mathematics, science, social studies, and career exploration. The non-academic courses are described as follows:

Career Orientation

Career Orientation is an exploratory shop/laboratory class utilizing the cluster concept in which students rotate through several program areas during the year. It provides a variety of activities designed to acquaint the student with the Advanced Career Training programs available and assure equity and access in vocational enrollment.

Technical Information Skills

The goal of the Technical Information Skills course is to provide instructions in multi-occupational competencies such as keyboarding, technology concepts, technical design, and ap-

plications of current and emerging technologies to supplement and enhance the students' vocational interest.

\* \* \* \* \* \*

Career Exploration

Career Exploration will allow students to explore one or more occupational clusters introduced in Career Orientation in which the student demonstrated an interest or aptitude. The non-academic courses contained in Tech Four also could seemingly be incorporated into the curriculum of the comprehensive high schools.

**20.** Because we hold the district court abused its discretion in failing to hold an evidentiary hearing, we do not address the Special School District's claims that the district court denied it due process, rendered an unconstitutional advisory opinion, and erred in failing to give greater deference to its educational expertise.

record to support the view that at least one vocational school should be closed. Whether this school should be South Tech or one of the other vocational schools is an open question. The Special School District vocational schools are operating at a fraction of their capacity, thus hindering their ability to concentrate resources on improving curriculum, upgrading facilities, purchasing new equipment, integrating student bodies and staff, providing compensatory and remedial programs for students, and allocating necessary funds for recruitment, counseling and placement. It is also apparent from the record that the district judge has thought long and hard about the best way to achieve an integrated vocational education system for the metropolitan area and has had several executive sessions with the parties in a search for a solution to a very difficult problem.

Nonetheless, we believe that the parties are entitled to an evidentiary hearing to explore in-depth the question of whether the closing of South Tech is the closing most likely to achieve, over the long term, a quality integrated vocational education system for the entire St. Louis metropolitan area. We stress that the O'Fallon student body remains largely black and is perceived in the St. Louis metropolitan area as the black vocational school. It will not be integrated by simply transferring popular unduplicated programs from the Special School District to the city. Thus at the

hearing, each of the concerns previously mentioned in this opinion must be addressed. Action must be taken to integrate the faculty at the Special School District vocational schools. It is important to note at this point that progress has been made in integrating the student bodies at West Tech and North Tech. This progress must not be lost in any new plan.

■ The plan ultimately approved by the district court should promise integration, quality, and stability [21] and give the MCC and the school districts the opportunity to implement the plan fully and carefully. The financial ability of the Special School District and the City Board to implement the plan must be fully explored.[22] The City Board must have the resources to implement the plan without adversely affecting the quality of education in its comprehensive or magnet schools or without limiting the ability of the City Board to implement the remedial and compensatory programs heretofore mandated by the court for the all-black schools. See *Liddell VII*, 731 F.2d at 1309–19; *Liddell VIII*, 758 F.2d 290, 293–99 (8th Cir.), *modified on rehearing*, 758 F.2d 303 (8th Cir.1985); *Liddell IX*, 801 F.2d 278 (8th Cir.1986). Consistent with this Court's opinions, the district court must make sure that such resources are available to the City Board. *Liddell VII*, 731 F.2d at 1319–23; *Liddell VIII*, 758 F.2d at 300–02.[23]

21. The Special School District has argued in this appeal that the district court, in assessing the enrollment at South Tech, did not take fully into account handicapped students attending day classes or adults taking evening courses. We believe that the district court should certainly consider the effect of its ruling on handicapped students and, to a lesser extent, on the adult students. Nevertheless, this does not mean that the district court can lose sight of its primary purpose: to integrate the vocational high schools. Handicapped students must be included in the integration process; however, their interests as handicapped students cannot take primacy over the general goal of integration.

22. It appears from the record that the Special School District can implement a future plan using its own resources. If West Tech is closed and sold or leased, substantial resources should be available to the Special School District.

23. As we held in *Liddell VII*, "the district court's broad equitable powers to remedy the evils of segregation include a narrowly defined power to order increases in local tax levies on real estate." 731 F.2d at 1320. Under the 12(b) plan, the City Board could also petition the district court for the allocation of such funds under paragraph 12 of the 12(b) plan (paragraph 13 of the original 12(b) plan) which provides:

In the event that either Board is unable to fund any increased costs from current revenues including its desegregation funds or from other conventional sources, such as local funds, foundation aid, state and federal vocational aid and state transportation reimbursement, upon certification by the Committee [MCC] that such costs and expenses are essential to the implementation of this plan, either Board shall apply to the Court for such appropriate orders as may be necessary to

### Relocation Costs and MCC Staffing Responsibilities

In its January 30, 1987, order, the district court held that (1) the costs of equipment relocation and of building modifications upon closing South Tech and West Tech should be borne equally by the State, the Special School District, and the City Board; and (2) the MCC shall develop a staffing plan to accommodate the reduced and reassigned members of the vocational schools' staffs resulting from the closing of South Tech and West Tech. The City Board disputes both these rulings.

The City Board and the Special School District estimate that relocation costs will exceed $4 million. Thus, each party's share of the cost will be approximately $1.33 million.

The City Board argues that, in distributing the relocation costs equally among the three parties, the district court ignored paragraph 11 of the 12(b) plan and this Court's approval of that plan in *Liddell V.* Paragraph 11, provides:

> Wherever possible unduplicated programs will be developed from existing equipment, and the Committee will allocate such programs between the two districts so that neither district is burdened with such program equipment cost unfairly. Where existing equipment is used, the State will be responsible only for the costs due to relocation and modification of the equipment or buildings.

■ We note initially that this opinion requires the district court to conduct an evidentiary hearing to determine which of the Special School District vocational schools should be closed. At that evidentiary hearing, it will be appropriate to take testimony with respect to the relocation costs resulting from the final order of consolidation. When this process has been completed, it lies within the discretion of the district court to divide the relocation costs equally among the State, the Special School District, and the City Board if it determines that such distribution would be fair. In any such allocation it must make

secure additional funds essential for such purpose.

sure that the City Board has the financial resources to meet its share of the cost without adversely affecting its ability to finance the other desegregation programs mandated by this Court. *See supra* p. 1457. It does not appear at this time that the Special School District will have any problem meeting its share of the costs because of the savings from the closing of one or more of its vocational schools and because of further potential funds from the sale of any closed schools.

The City Board also argues that empowering the MCC to develop a restaffing plan extends the MCC's powers beyond those enumerated in the 12(b) plan and also violates the first paragraph of that plan which provides:

> Primary Governance of the consolidated vocational-technical school programs of the Board of Education of the City of St. Louis * * * and the Board of Education of the Special School District * * * will remain vested in each of the two existing Boards of Education, respectively. This vested authority is the policy decision making responsibility of the respective boards including, but not limited to, the operation of the respective programs, employment of staff, development of personnel and appropriation of funds to meet each district's needs.

■ We find little merit in this contention. It is clear that the MCC must be given additional authority and must be permitted to act with more independence and objectivity than it has in the past if the vocational schools in the St. Louis metropolitan area are to be integrated. Even with its power enhanced, the MCC must have the close cooperation of the school districts if a Phase III plan is to succeed.

### Transportation Costs

The district court held in its February 25, 1986, order that the State should pay the total transportation costs for interdistrict transfers. Order of February 25, 1986, L(746)86, at 3–4. The State contends that

*See* 654 F.Supp. 334.

this is contrary to the Memorandum of Understanding entered into by the State, the Special School District, and the City Board under which each district was responsible for paying the transportation costs of interdistrict transfer students. The State argues that the district court's rationale for changing this arrangement is to make the burden of the State in the 12(b) plan consistent with its burden under paragraph 12(c) of the settlement plan. *See Liddell*, 491 F.Supp. at 353. *Liddell VII*, 731 F.2d at 1301–09.

■ According to the State, its obligations under the 12(b) plan and paragraph 12(c) are not comparable because 12(b) of the district court's 1980 order required complete consolidation of the vocational schools. If that merger had taken place as originally intended, there would be one district and thus no "interdistrict" transfers. According to the State, transportation under the 12(b) plan thus has operated as if there were only one school district. We find the State's arguments unpersuasive. While we agree that full consolidation was the original intent of the 1980 order, it has not occurred. In fact, the State successfully opposed consolidation. We find no error in the district court's transportation funding order.

### The Elimination of Racial Goals within Programs

In its January 30, 1987, decision, the district court stated that each vocational school in the system must meet the racial goals specified in its order (55% white/45% black with a 10% variance). It went on to hold, however, that racial goals within specific vocational programs could be eliminated. It stated:

It is the Court's fervent belief that careful programming should naturally create a racial balance in the two remaining schools. Racial goals within a program is not always the answer to a difficult situation. Instead of promoting desegegation [sic] as a natural accommodation

of races within a school, racial goals in the 12(b) plan, and perhaps in the entire voluntary plan, have served only to limit access to the classroom for white and black students. Efforts should be directed at making programs attractive to students in the minority, instead of meeting racial quotas. * * * The elimination of racial goals within the classroom does not mean that the schools are free to become segregated again. The MCC retains its responsibility to assign students to each class in such a manner that will still provide desegregation in the school as a whole.

654 F.Supp. at 339.

■ No party to the appeal objects to this change. We approve it, albeit with great reluctance. We cannot and will not accept the steering of students into programs to recreate a segregated atmosphere. All parties to this action have a continuing grave responsibility to avoid the segregation of students within programs.

Our reluctant approval[24] of the district court's order stems in part from a review of the record which indicates that, as the years progress, fewer blacks are being denied admission to programs because of racial goals. Data submitted by the City Board and the Special School District indicate that in 1984–85, 105 blacks and eight whites, for a total of 113 students, were denied admission to the school of their choice. In 1985–86, 120 blacks and twenty-one whites, for a total of 141 students, were denied admission to the school of their choice. In 1986–87, only forty-nine blacks and one white, for a total of fifty students, were denied admission to the school of their choice; some of these were denied admission for reasons other than race.

### Conclusion

The voluntary plan to desegregate the vocational schools of the metropolitan St. Louis area has now been in effect for six years. The plan has not successfully inte-

---

**24.** This approval of the district court's adjustments of the racial goals in the vocational school programs does not in any way affect the racial goals in non–12(b) desegregation programs.

grated the vocational schools. When this Court originally approved the voluntary plan, we made it clear that if the voluntary plan did not work, we retained the authority to order the complete merger of the vocational programs with a unified governing and taxing structure. The parties in effect urge us to give them one more chance to integrate voluntarily the vocational schools. We grant this request but emphasize that the authority to order merger or consolidation persists and that the new Phase III plan will only be successful if all the concerns reflected in this opinion are addressed.

It is important that the 1987–88 school year for the St. Louis metropolitan vocational high schools be a successful one. It is equally important that the plan ultimately approved by the district court be one that promises stability. We therefore leave to the district court the question of whether to implement any new plan in time for the 1987–88 school year, or to permit South Tech to operate for another year while the matter of the future configuration of the vocational high schools in the St. Louis area is being resolved. We thus affirm the district court's orders of February 25, 1986, and January 30, 1987, except insofar as the latter order requires that South Tech be closed without a hearing. We remand the case to the district court for further proceedings consistent with this opinion.[25]

Each party to this appeal, other than the Liddell plaintiffs, shall bear its own costs. The Liddell plaintiffs' costs shall be borne equally by the State, the Special School District, and the City Board. The mandate of this Court shall issue forthwith.

---

**25.** We note that one of the parties may wish to move for the complete consolidation of the vocational programs at O'Fallon and those at the Special School District vocational schools as permitted by paragraph 16 of the original 12(b) plan and our decision in *Liddell V*, 677 F.2d at 636.